UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                               :

ANTHONY ANDRE PAUL and ALBERTY   :
PAUL, as Co-Administrator of the Estate of   :
Anthony Andre Paul II, deceased,   :
                               :
                   Plaintiffs,   :
                               :
           -against-            :
                               :
CITY OF NEW YORK, et al.,   :
                               :
                 Defendants.  :
----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___9/25/2017___

16-CV-1952 (VSB)

**MEMORANDUM & OPINION**

Appearances:

Derek S. Sells
Stephanie R. Correa
The Cochran Firm
New York, New York
*Counsel for Plaintiffs*

Susan P. Scharfstein
*for* Zachary W. Carter
Corporation Counsel for the City of New York
New York, New York
*Counsel for Defendants City of New York, Vincent Giordano, Eugene McCarthy, Michael
Licitra, Anthony DiFrancesca, Richard Hefner, Aramis Ramos, Darren McNamara, Andrew
McCormack, Finbarr McCarthy, and Kevin O'Doherty*

VERNON S. BRODERICK, United States District Judge:

      This case arises from events that occurred on July 1, 2015, and the subsequent death of

Anthony Andre Paul II on July 2, 2015.  Paul's estate ("Plaintiffs") brings this action against the

City of New York (the "City"), North Central Bronx Hospital, New York City Health and

Hospitals Corporation (the "Hospital Defendants"), and Deputy Chief Vincent Giordano, Captain

Eugene McCarthy, Lieutenant Michael Licitra, Detective Anthony DiFrancesca, Detective

Richard Hefner, Police Officer Aramis Ramos, Detective Darren McNamara, Detective Andrew

McCormack, Detective Finbarr McCarthy, and Sergeant Kevin O'Doherty (the "Individual Defendants," and collectively with the City, the "Defendants"). The City and Individual Defendants move for dismissal of certain of the causes of action. (Doc. 167.) For the reasons stated herein, the motion is GRANTED IN PART and DENIED IN PART. Specifically, Defendants' motion to dismiss is granted as to the causes of action alleging: (1) negligent hiring, training, and supervision on the part of the City; (2) supervisory liability claims as against Defendants DiFrancesca, Hefner, McNamara, McCormack, Finbarr McCarthy, and Ramos; (3) claims of New York State statutory violations; (4) claims of negligence against the City; (5) false arrest; and (6) medical malpractice against the City. Defendants' motion to dismiss is denied with respect to the causes of action alleging: (1) claims against Defendants McCormack and Finbarr McCarthy for lack of personal involvement; (2) the *Monell* claim against the City; and (3) claims against the Individual Defendants for failure to intervene. Defendants' motion to dismiss the wrongful death claim is granted, except Plaintiffs are given leave to re-plead this claim to cure the defect described herein.

## I.     Factual Background[1]

On July 1, 2015, Anthony Andre Paul II ("Paul") was a resident of Narco Freedom, Inc.'s Freedom House 19 ("Freedom House"), a three-quarter house located at 2846 Briggs Avenue in

---

[1] The following factual summary is drawn from the allegations of the Amended Complaint, which I assume to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

the Bronx.[2]  (Am. Compl. ¶ 41.)[3]  At approximately 9:00 p.m. that evening, a 911 call was placed to a New York Police Department ("NYPD") dispatcher regarding an alleged emotionally disturbed person ("EDP") at the Freedom House.  (*Id.* ¶ 42.)  Defendant NYPD's Emergency Services Unit ("ESU") was assigned to respond to this call.  (*Id.* ¶ 43.)  The ESU is a specialized unit tasked with responding to emergencies involving barricaded suspects and EDPs.  (*Id.*)

When ESU police officers arrived on the scene, they apparently observed Paul in an emotionally disturbed state; he was naked and locked in his room, but not presenting any danger to himself or others.  (*Id.* ¶ 44.)  Officers then "inserted cameras" into Paul's room to observe and record what was transpiring inside.  (*Id.* ¶ 45.)  They attempted multiple times to unlock the door, (*id.* ¶ 46), but each time, Paul turned the lock to prevent police from entering his room, (*id.* ¶ 47).  A hostage negotiator employed by Defendants unsuccessfully attempted to convince Paul to allow "the police to enter his room and get him treatment for his emotional disturbance."  (*Id.* ¶ 48.)

Paul was "isolated and contained in his room for several hours and not presenting any immediate threat of serious physical injury or death to himself or others."  (*Id.* ¶ 50.)  Nevertheless, officers ultimately entered Paul's room to take him into custody.  (*Id.*)  Specifically, certain officers attempted to breach the door by using a sharp saw blade, at the direction and order of Defendants Deputy Chief Giordano, Captain McCarthy, and Lieutenant Michael Licitra.  (*Id.* ¶ 54.)  When the blade breached the door, Paul, "who was guarding the

---

[2] The Amended Complaint does not contain a definition or description for three-quarter house.  However, an Opinion and Order issued in this district in a case involving Narco Freedom, Inc. provided the following description: "three-quarter houses do not provide in-house services to tenants, are not licensed or regulated, and have no formal arrangement with any government agency.  The staff members at the Freedom Houses do not have mental health training, and some Freedom Houses staff as few as one employee for every one hundred residents."  *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 750 (S.D.N.Y. 2015) (internal citations omitted).

[3] "Am. Compl." refers to Plaintiffs' amended complaint filed on October 26, 2016 ("Amended Complaint").  (Doc. 151.)

door, came into contact with the blade and had his arms and hands sliced up with more than 30 cuts." (*Id.*) As Paul bled profusely, officers including Defendants DiFrancesca, Hefner, Ramos, McNamara, and O'Doherty made a "full breach of the door." (*Id.* ¶ 55.) Upon entering the room, these officers, at the direction of Defendant Captain McCarthy, "used excessive physical force and unnecessary electric current (tasers) to arrest him and take him into custody." (*Id.* ¶ 55.) Paul was tasered a total of thirteen times: seven times by Defendant DiFrancesca and six times by Defendant McNamara, in violation of the NYPD Patrol Guide for Use of Tasers. (*Id.* ¶ 56.) Paul was struck by at least three taser prongs, indicating that at least two tasers were used against him, also in violation of the Patrol Guide. (*Id.* ¶ 57.) Officers also failed to reassess Paul's condition after each electrical discharge, in violation of Section 212-117 of the Patrol Guide. (*Id.* ¶ 58.)

Paul was placed under arrest, handcuffed by Defendants Ramos and Hefner, (*id.* ¶ 60), and the New York City Emergency Medical Services of the New York City Fire Department ("EMS") was called to take Paul to North Central Bronx Hospital ("NCBH"), (*id.*). EMS personnel exacerbated Paul's injuries by failing to give him proper medical attention. (*Id.* ¶ 61.) Specifically, the EMS personnel failed to administer sedatives to Paul despite seeing that he was "agitated" and "combative." (*Id.*) NCBH also allegedly further exacerbated Paul's injuries by failing to administer sedatives after learning of the circumstances. (*Id.* ¶ 62.) Shortly after arriving at the hospital, Paul's heart stopped beating and he died. (*Id.* ¶ 5.)

Under Section 216-05(c)(1) of the Police Patrol Guide, when police encounter an EDP who does not present an immediate threat of serious physical injury or death to himself or others, they are instructed to "[a]ttempt to isolate and contain the EDP." (*Id.* ¶ 49.) The Amended Complaint alleges that the officers violated the standard set in their the Police Patrol Guide and

were following an "unconstitutional policy, practice, and/or rule of the NYPD in dealing with EDPs who are isolated and contained within their rooms of forcing entry and needlessly escalating a non-confrontational encounter to one requiring a forceful confrontation between the EDP and police." (*Id.* ¶ 51.) The NYPD was allegedly on notice of the harm this practice has caused from at least April 29, 2014, when Chief of Department Phillip Banks wrote to Police Commissioner Bill Bratton concerning an earlier incident involving an emotionally disturbed person ("Banks Communication") stating:

> On several occasions in the past, while attempting to make partial door breaches to insert cameras, the emotionally disturbed person has charged the door. Once it occurred, ESU personnel have no choice but to engage. If the door was never breached, they [wouldn't have] found themselves in that situation.

(*Id.* ¶ 53 (alteration in original).) Indeed, two weeks prior to Paul's death, another individual suffering from an emotional disturbance in the Bronx was killed by the NYPD. (*Id.* ¶ 7.)

After Paul's death, Commissioner William Bratton falsely stated during a press conference on August 4, 2015 that the incident was caused by Paul being high on K2, a synthetic marijuana, (*id.* ¶ 6), despite the fact that no K2 was detected in Paul's toxicology report, (*id.* ¶ 7). The purpose of the press conference was allegedly an attempt to shield the NYPD from public criticism of its treatment of the mentally ill and emotionally disturbed. (*Id.*)

## II.     Procedural History

Paul's estate initiated this action on March 16, 2016, against the City, EMS, twenty-four members of the NYPD, NCBH, and New York City Health and Hospitals Corporation ("HHC"). (Doc. 1.) The parties entered into a stipulation of confidentiality, pursuant to which the City produced some preliminary discovery concerning the incident, including NYPD internal investigatory documents maintained by the Force Investigation Division and the Internal Affairs

Bureau, records maintained by other NYPD units (the Technical Assistance Response Unit, the Crime Scene Unit, and ESU), and materials originating from the New York City Fire Department, the Office of the Medical Examiner, the Comptroller's Office, and the Bronx County District Attorney's Office. (Defs.' Mem. 5.)[4]

Plaintiffs were granted leave to amend their complaint, and did so on October 25, 2016. (Doc. 151.) The Amended Complaint contains the following causes of action: (1) unlawful entry in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, against the Individual Defendants (First Cause of Action); (2) excessive force in violation of the Fourth and Eighth Amendments, pursuant to § 1983, against the Individual Defendants (Second Cause of Action);[5] (3) *Monell* against the City for maintaining a policy or practice of forceful entry into the space of an isolated and contained EDP without justification of provocation, and for failure to hire and train, pursuant to § 1983 (Third Cause of Action); (4) negligent hiring, training and supervision on the part of the City under New York State law (Fourth Cause of Action); (5) supervisory liability against the Individual Defendants with supervisory duties, under § 1983 (Fifth Cause of Action); (6) failure to intervene on the part of Individual Defendants present, under § 1983 (Sixth Cause of Action); (7) negligence and/or statutory violations of New York State law (Seventh Cause of Action); (8) wrongful death under New York State law (Eighth Cause of Action); (9) intentional torts under New York State law (Ninth Cause of Action); (10) medical malpractice

---

[4] "Defs.' Mem." refers to Defendants City of New York, Vincent Giordano, Eugene McCarthy, Michael Licitra, Anthony DiFrancesca, Richard Hefner, Aramis Ramos, Darren McNamara, Andrew McCormack, Finbarr McCarthy, and Kevin O'Doherty's Memorandum of Law in Support of Their Motion to Dismiss. (Doc. 168.)

[5] I note that to the extent Plaintiffs allege violations of the Eighth Amendment, those claims must be dismissed because Paul was not a convicted inmate at the time of the incident. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("'Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. . . . The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'" (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–72 n.40 (1977))). Instead, the relevant constitutional provision is the Due Process Clause of the Fourteenth Amendment. *See id.*

against Defendants HHC and NCBH (Tenth Cause of Action); and (11) medical malpractice as to the City (Eleventh Cause of Action).[6]  Defendants filed their motion to dismiss on February 3, 2017, (Doc. 167), Plaintiffs filed their response on March 3, 2017, (Doc. 169), and Defendants filed their reply on March 21, 2017, (Doc. 172).

### III.     Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Id.*

---

[6] In amending their complaint, Plaintiffs withdrew claims against 15 individual defendants and EMS.  (*See* Doc. 151-3.)

## IV.   Discussion

Defendants move to dismiss the following causes of action:  (1) the unlawful entry and excessive force claims against Defendants McCormack and Finbarr McCarthy only; (2) the *Monell* claim against the City; (3) the negligent hiring, training, and supervision claims against the City under New York State law; (4) the supervisory liability claim against certain individual Defendants; (5) the failure to intervene claim as to the Individual Defendants; (6) the claim against the City for negligence and statutory violations under New York State law; (7) the wrongful death and intentional tort claims as against Defendants under state law; and (8) the medical malpractice claim against the City.  I address each in turn.

### A.   *Unlawful Entry and Excessive Force on the Part of Defendants McCormack and Finbarr McCarthy*

A plaintiff must allege facts showing an individual defendant's personal involvement in causing the harm alleged to sustain a § 1983 claim.  *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995))).  "Personal involvement" is defined as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts, rather than doing them him- or herself."  *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).  Thus, "[a] police officer is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so."  *Vesterhalt v. City of New York*, 667 F. Supp. 2d 292, 297 (S.D.N.Y. 2009) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)).

However, "[a] plaintiff need not establish which officer, among a group of officers, directly participated in the attack and which officer failed to intervene." *Id.*; *see also De Michele v. City of New York*, No. 09 Civ. 9334(PGG), 2012 WL 4354763, at *17 (S.D.N.Y. Sept. 24, 2012) (explaining that a plaintiff "need not establish who, among a group of officers, directly participated in the attack and who failed to intervene" (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003))).

In listing the individual defendants involved, the Amended Complaint alleges in a conclusory manner that each Individual Defendant, including Detectives McCormack and Finbarr McCarthy, "directly participated in the unlawful activity that is the subject of the Complaint." (Am. Compl. ¶¶ 33–34.) In describing the events, the Amended Complaint does not consistently specify exactly which officer did what, and instead, at various points, refers to the Individual Defendants as a group. (*See, e.g.*, *id.* ¶ 54 ("Defendants herein attempted to breach the door . . . .").) The Amended Complaint does, however, state that Defendants McCormack and Finbarr McCarthy were detectives with the ESU, (*id.* ¶¶ 33, 34), that the ESU was responsible for responding to this incident, (*id.* ¶ 43), and that the individual officer defendants, collectively, arrived at the scene and observed the situation, (*id.* ¶¶ 44–45). These allegations imply that all of the Individual Defendants in the ESU, including McCormack and Finbarr McCarthy, were at least present at the scene and witnessed the events. This is sufficient to allege that Defendants McCormack and Finbarr McCarthy were "present during the assault, and fail[ed] to intercede on behalf of the victim even though [they] had a reasonable opportunity to do so." *Vesterhalt*, 667 F. Supp. 2d at 297.

Therefore, Defendants' motion to dismiss claims against Defendants McCormack and Finbarr McCarthy is DENIED.[7]

**B.**    *Monell Liability*

A municipality or local government is liable under Section 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted). Local governments are not vicariously liable under Section 1983, and instead are responsible only for their own illegal acts. *Id.* "A municipality may, however, be liable under § 1983 when the alleged deprivation of constitutional rights is the result of action pursuant to an official municipal policy, or the municipality exhibits deliberate indifference to the possibility of such a constitutional violation." *Williams v. City of New York*, 690 F. Supp. 2d 338, 343 (S.D.N.Y. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). In addition, "the deprivation of the plaintiff's rights [must be] caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). The municipality must have been the "moving force" behind the alleged injury. *Roe v. City of Waterbury*, 542 F.3d 31, 36–37 (2d Cir. 2008).

"Isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability. On the other hand, such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to

---

[7] Because I reject Defendants McCormack and Finbarr McCarthy's motion to dismiss claims against them for Section 1983 liability for false arrest and excessive force, I also reject their same arguments to dismiss the state law assault and battery claims against them. (*See* Defs.' Mem. 20–21.)

support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones*, 691 F.3d at 81 (internal citations omitted). A municipality may also be liable for a "policy of inaction in light of notice that its program will cause constitutional violations," which is "the functional equivalent of a decision by the city itself to violate the Constitution." *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Connick*, 563 U.S. at 61–62); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."). In the case of such inaction, a plaintiff can prevail by showing that the policymaking official "was aware of the employee's unconstitutional actions and consciously chose to ignore them." *Jones*, 691 F.3d at 81. A plaintiff must show that the policymaking official exhibited "deliberate indifference to constitutional deprivations caused by subordinates." *Cash*, 654 F.3d at 334 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.)). Such inaction may include a local government's decision "not to train certain employees about their legal duty to avoid violating citizens' rights." *Connick*, 563 U.S. at 61.

In such cases, a plaintiff must allege that the inaction or failure to train amounts to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* Deliberate indifference is a fact-intensive inquiry. *See Cash*, 654 F.3d at 334 (stating that the standard "necessarily depends on a careful assessment of the facts at issue in a particular case"). The key question is whether the facts alleged "demonstrate that the

policymaker's inaction was the result of conscious choice and not mere negligence." *Id.* (internal quotation marks omitted). Plaintiffs must show that the policymaking official had notice "of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference." *Amnesty*, 361 F.3d at 128 (internal citation and quotation marks omitted). Deliberate indifference is often established by a pre-existing pattern of violations. *See City of Canton v. Harris*, 489 U.S. 378, 397 (1989). However, it may also be inferred in the rare situation where the "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64; *see also Cash*, 654 F.3d at 334 (deliberate indifference may be "inferred where 'the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiff[]" (internal citations and quotation marks omitted)).

Here, Plaintiffs claim that the NYPD had a custom, practice or policy of "forcefully entering the space of an isolated and contained EDP without justification or provocation" knowing that "such entry is a well-known trigger for an EDP that causes reactions requiring an escalation in the use of force against the EDP." (Am. Compl. ¶ 74.) Defendants first argue that this theory of municipal liability does not state a *Monell* claim because law enforcement officers are generally not liable for actions leading up to the use of excessive force, as the Fourth Amendment reasonableness inquiry "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ" the force. *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996). Thus, the City argues, there

is no policy of violating of a federally protected right. (Defs.' Mem. 8–9.) This argument is off the mark. Whether an individual officer has violated the Fourth Amendment during a particular encounter is an entirely separate question from whether a municipal policy caused a constitutional violation. While the municipal policy must be the "moving force" behind the ultimate constitutional injury, *see Roe*, 542 F.3d at 36–37 (2d Cir. 2008), it need not be facially unconstitutional, *see Canton*, 489 U.S. at 386–87. Here, Plaintiffs have adequately alleged that the NYPD had a policy that needlessly escalated otherwise safe situations by breaching doors of contained EDPs, which caused constitutional violations to which the City was deliberately indifferent. While Plaintiffs are of course required to plead an actual constitutional injury that resulted, they have done so here, which Defendants implicitly concede by choosing not to move to dismiss the excessive force and unlawful entry claims.

Defendants also argue the Banks Communication does not support a plausible inference of the existence of an unconstitutional policy, and is "more fairly construed as raising a thoughtful inquiry as to law enforcement best practices in light of evolving experience with EDPs." (Defs.' Mem. 9.) Again, Defendants' arguments display a fundamental misunderstanding of *Monell* doctrine; Plaintiffs need not establish that the municipal policy itself is facially unconstitutional. *See Canton*, 489 U.S. at 386–87 (rejecting argument that "only unconstitutional policies are actionable under [§ 1983]"). Defendants also misconstrue the force of the Banks Communication, which cites "several occasions in the past," (Am. Compl. ¶ 53), and supports Plaintiffs' allegation that the Police Commissioner was on notice of the danger posed by partial door breaches involving emotionally disturbed persons. The Amended Complaint also alleges that at least two other EDPs have died during interactions with NYPD officers. (*Id.* ¶¶ 7, 53.) Moreover, the fact that the Banks Communication could also be viewed

as "a thoughtful inquiry as to law enforcement best practices in light of evolving experience with EDPs," (Defs.' Mem. 9), does not mean that the Communication is not relevant to and/or evidence of a policy and an alleged *Monell* violation.  Thus, Plaintiffs have plausibly asserted a municipal policy and inaction in light of notice of constitutional deprivations on the part of the NYPD.

Next, Defendants argue that the Amended Complaint fails to plausibly allege failure to train.  The Amended Complaint does not specify a particular deficiency in the NYPD's training program.  However, Plaintiffs do allege that the ESU is a "specialized unit" tasked with handling people experiencing "emotional disturbances," (Am. Compl. ¶ 43), which implies some amount of additional training on interacting with mentally disturbed individuals.  Moreover, plaintiffs cannot be expected to know the specifics about a municipality's training program or be able to name the alleged deficiencies at the pleading stage.  *See Amnesty*, 361 F.3d at 130 n.10 ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation.  After discovery, on the other hand, a plaintiff is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation.").

Therefore, dismissal of Plaintiffs' *Monell* claim at the motion to dismiss stage is premature under the circumstances presented here, and Defendants' motion to dismiss the *Monell* claim is DENIED.

## C.    *Negligent Hiring, Training, or Supervision*

A negligent hiring, training, or supervision claim under New York law requires a plaintiff to allege "that the defendant knew or should have known of its employee's propensity to engage in the conduct that caused the plaintiff's injuries, and that the alleged negligent hiring, supervision or retention was a proximate cause of those injuries." *Harisch v. Goldberg*, No. 14-cv-9503 (KBF), 2016 WL 1181711, at *14 (S.D.N.Y. Mar. 25, 2016) (quoting *Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S. 2d 442, 445 (3d Dep't 2011)).  This tort requires a plaintiff to establish that the employee was acting outside the scope of his or her employment and applies only "in instances where an employer cannot be held vicariously liable for an employee's torts." *Id.* (quoting *State Farm Ins. Co. v. Cent. Parking Sys., Inc.*, 796 N.Y.S.2d 665, 666 (2d Dep't 2005)).  Thus, "where the acts of 'employees' are concerned, an employer can be held vicariously liable under principles of *respondeat superior* for acts committed *within* the scope of the employee's employment, or may be held directly liable for 'negligent hiring, retention, or supervision' for acts committed *outside* that scope." *Williams v. Boulevard Lines, Inc.*, No. 10 Civ. 2924(DF), 2013 WL 1180389, at *13 n.10 (S.D.N.Y. Mar. 12, 2013); *see also Karoon v. NYC Transit Auth.*, 659 N.Y.S.2d 27, 29 (1st Dep't 1997) ("Generally, where an employee is acting within the scope of his or her employment, thereby rendering the employer liable for any damages caused by the employee's negligence under a theory of respondeat superior, no claim may proceed against the employer for negligent hiring or retention.").

While Plaintiffs are correct that they may hypothetically plead alternative and inconsistent factual positions under Federal Rule of Civil Procedure 8, *see* Wright & Miller, 5 Fed. Practice & Procedure § 1285 (3d ed. 2012), there are no allegations in the Amended Complaint that the officers were at any point acting outside the scope of their duties and none of

the facts as alleged directly or inferentially supports such a finding. Indeed, Plaintiffs' position

is that the officers "*were* acting within the course and scope of their employment." (Am. Compl.

¶ 95.) The Amended Complaint also describes behavior that could only be understood as within

the scope of their employment as officers with the NYPD. (*See, e.g.*, *id.* ¶¶ 54, 55.) In

determining whether an employee is acting within the scope of his employment, courts consider

"the connection between the time, place and occasion for the act; the history of the relationship

between employer and employee as spelled out in actual practice; whether the act is one

commonly done by such an employee; the extent of departure from normal methods of

performance; and whether the specific act was one that the employer could reasonably have

anticipated." *Harisch*, 2016 WL 1181711, at *14 (quoting *Riviello v. Waldron*, 418 N.Y.S.2d

300, 303 (1979)). Although Plaintiffs claim that the officers deviated to some degree from the

guidance set forth in the NYPD Patrol Guide, (*see, e.g.*, Am. Compl. ¶¶ 57–58), their failure to

strictly adhere to the NYPD guidelines is insufficient to allege that the officers were acting

outside their normal course of duties as NYPD officers. Notably, in Plaintiffs' opposition, they

do not point to any facts in the Amended Complaint that support their allegation that the officers

were acting outside the scope of their employment. *See Melvin v. Cty. of Westchester*, No. 14-

CV-2995 (KMK), 2016 WL 1254394, at *21 (S.D.N.Y. Mar. 29, 2016) ("The [negligent hiring,

supervision, and retention claim] must fail precisely because the [complaint] offers no

allegations that [defendants] were acting outside [their] scope of employment during the course

of events giving rise to Plaintiff's claim."); *Harisch*, 2016 WL 1181711, at *14–15 ("As with

any substantive assertion in a complaint, the facts alleged in support of a cause of action for

negligent hiring, supervision, or retention must support a plausible argument that the employee's

actions were outside the scope of her employment."); *Marotta v. Palm Mgmt. Corp.*, No. 05 Civ.

10688(LTS)(HBP), 2009 WL 497568, at *4 (S.D.N.Y. Feb. 25, 2009) (dismissing claim of negligent hiring, retention, training or supervision for failure to plead "factual allegations . . . that [defendants] at any time acted outside their normal course of duties").

Accordingly, Defendants' motion to dismiss Plaintiffs' claim of negligent hiring, retention, training, or supervision is GRANTED.

### D. *Supervisory Liability Against Non-Supervisory Defendants*

Plaintiffs concede that Defendants DiFrancesca, Hefner, McNamara, McCormack, Finbarr McCarthy, and Ramos are not alleged to have had supervisory roles. (Pls.' Mem. 18; Am. Compl. ¶¶ 29–34.)[8] Therefore, the supervisory liability claims against them are dismissed, and Defendants' motion to dismiss as related to them is GRANTED.

### E. *Failure to Intervene*

Defendants argue that the Amended Complaint fails to allege that the Individual Defendants had a reasonable opportunity to intercede to prevent Paul from harm, and also fails under Rule 8(a)(2) to differentiate among the officers present to state which ones were directly involved in the force applied and which failed to intervene. (Defs.' Mem. 15–17.) "[A]n officer who fails to intervene to prevent other officers from causing harm can be held liable 'where that officer observes or has reason to know that excessive force is being used.' Liability does not attach, however, unless the officer had 'a realistic opportunity to intervene to prevent the harm from occurring.'" *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 387 (S.D.N.Y. 2013) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

---

[8] "Pls.' Mem." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss Pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 169.)

The Amended Complaint alleges that all the named officers responded to the scene, all were on scene for several hours, some officers participated in the door-breach and employed force, and some officers witnessed the incident.  This is sufficient to state a claim and to give Defendants fair notice of the claims against them, especially in the wrongful death context where Plaintiffs are in no position to provide additional specificity.  *See Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) ("Where a plaintiff has properly alleged a constitutional violation, he is 'entitled to discovery to determine which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene.'" (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012))).  Although Plaintiffs have apparently had access to some pre-discovery disclosures, including internal investigatory documents and witness statements, (Defs.' Mem. 17), whether the allegations in the Amended Complaint related to Plaintiff's failure to intervene claim are sufficient to withstand Defendants' motion to dismiss is not dependent on the pre-discovery disclosures.

Therefore, Defendants' motion with regard to the failure to intervene cause of action is DENIED.

**F.**     ***Negligence and Statutory Violations***

Count Seven of the Amended Complaint alleges "Negligence and/or Statutory Violations of New York State Law" against the Defendant City and NYPD.  Plaintiffs are unable to point to a state statute that Defendants violated; the NYPD Patrol Guide is not a statute, and cannot serve as a basis for liability.  *See Lopez v. City of New York*, 186 F. Supp. 3d 304, 313 n.7 (S.D.N.Y. 2016) ("[T]he Patrol Guide 'is not a body of law or regulation establishing clear legal duties that should serve as a basis for civil liability of municipalities.'" (quoting *Galapo v. City of New*

*York*, 721 N.Y.S.2d 857, 860 (2000))). Therefore, Plaintiffs' statutory violations claim is dismissed.

Plaintiffs appear to contend that the officers' failure to comply with the Patrol Guide is evidence of the unreasonableness of their conduct. The negligence claim, however, is asserted against the City, not the Individual Defendants. With respect to negligence on the part of the City, the Amended Complaint fails to state a claim. A municipality cannot be sued for common law negligence unless the municipality owed a special duty to the plaintiff. *See Valdez v. City of New York*, 936 N.Y.S.2d 587, 593–96 (2011). The duty must be more than one the municipality owed to the public generally. *See id.* A plaintiff must show the following to establish a special relationship:

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Hart v. City of New York*, No. 11 Civ. 4678(RA), 2013 WL 6139648, at *12 (S.D.N.Y. Nov. 18, 2013) (quoting *Valdez*, 936 N.Y.S.2d at 596). There are no allegations in the Amended Complaint that could support a finding of a special relationship between Paul and the police department beyond the duty owed by the NYPD to the public at large.

Therefore, Plaintiffs' negligence claim against the City must also be dismissed, and Defendants' motion to dismiss with regard to this cause of action is GRANTED.

## G. *Wrongful Death*

To state a wrongful death claim in New York, "the decedent's personal representative must plead: '(1) the death of a human being; (2) a wrongful act, neglect or default of the defendant that caused the decedent' death; (3) the survival of distributees who suffered pecuniary

loss by reason of the decedent's death; and (4) the appointment of a personal representative of the decedent." *Chamberlain*, 986 F. Supp. 2d at 398 (quoting *Pub. Adm'r of Queens Cty. ex rel. Estate & Beneficiaries of Guzman v. City of New York*, No. 06 Civ. 7099, 2009 WL 498976, at *12 (S.D.N.Y. Feb. 24, 2009)); *see also* N.Y. Estate, Powers & Trusts Law § 5-4.1.

Defendants argue that the wrongful death claim must be dismissed because Plaintiffs fail to allege the existence of distributees who suffered pecuniary loss as a result of Paul's death. I agree that the Amended Complaint fails to allege any distributees who suffered pecuniary loss resulting from Paul's death, but Plaintiffs should be permitted to re-plead. *See Case v. Anderson*, No. 16 Civ. 983 (NSR), 2017 WL 3701863, at *20 (S.D.N.Y. Aug. 25, 2017) (dismissing wrongful death claim for failure to allege pecuniary loss, but granting leave to re-plead); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 317 (S.D.N.Y. 1998) (same); *see also* Fed. R. Civ. P. 15(a) (providing that leave to amend a pleading "shall be freely giving when justice so requires"). If Defendants believe after reviewing this claim as re-pled that it is still deficient they are free to raise their concerns to me.

Therefore, Plaintiffs are permitted to amend their Amended Complaint within 20 days of the entry of this Memorandum and Opinion.

**H.** ***Intentional Tort of False Arrest***

Defendants also move to dismiss the state law false arrest claims against Defendants on the basis that the Amended Complaint fails to state that Paul was intentionally confined without justification.

To state a claim for false arrest under New York law, a plaintiff must establish that "the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "A warrantless seizure for the purpose of involuntary

hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (quoting *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993)).

To the extent Plaintiffs' false arrest claim is based on Paul's transport to the hospital for treatment, the Amended Complaint fails to state a claim. As alleged in the Amended Complaint, (1) when ESU police officers arrived on the scene they "apparently saw Paul in an emotionally disturbed state," (2) Paul was naked and locked in his room, (3) Paul refused to unlock the door and thwarted officers attempts to unlock the door, (4) by the time officers began using a saw to cut through the door to Paul's room he had been locked in his room for hours, (5) Paul repeatedly came into contact with the saw blade being used to cut the door causing "his arms and hands [to be] sliced up with more than 30 cuts," (6) Paul was bleeding profusely, (7) Paul was been tased multiple times, and (8) Paul badly needed medical attention. (Am Compl. ¶¶ 44, 46–47, 50, 54–56, 60.) Plaintiffs also allege that Defendants then failed to adequately respond to Paul's medical needs and neglected to perform additional treatment. (*Id*. ¶ 54.) These facts as alleged in the Amended Complaint support a belief by the Individual Defendants that there were reasonable grounds for believing Paul was a danger to himself. *See Anthony*, 339 F.3d at 137.

Therefore, the facts as alleged do not support the claim that seizure and transport was unreasonable under the circumstances, and Defendants' motion to dismiss the false arrest cause of action is GRANTED.

## I.    *Medical Malpractice*

Defendants argue that the medical malpractice claim as against the City should be dismissed because the Amended Complaint fails to state the existence of a special duty owed to Paul or that Paul justifiably relied on an affirmative undertaking by EMS personnel.

Emergency assistance rendered by first responders such as EMS personnel here is a governmental function for which the City cannot be held liable absent the applicability of the "special duty" doctrine. *See Applewhite v. Accuhealth, Inc.*, 972 N.Y.S.2d 169, 173 (2013). The New York Court of Appeals has recognized that a special duty can arise in three situations: "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition." *Id*.

Plaintiffs argue that they have established the factual predicate for Defendants' voluntary assumption of duty based on assurances by EMS personnel to Paul that they would take care of him and that he would be safe in their care in order to "calm the deceased and earn his trust and confidence." (Am. Compl. ¶ 117.) Assuming this to be true as I must, there are no facts suggesting that Paul justifiably relied to his detriment on the assurances such that he was "deprived . . . of assistance that reasonably could have been expected from another source." *Merced v. City of New York*, 552 N.Y.S.2d 96, 97 (1990). Because Paul did not "forego other available avenues of protection" based on the assurances, he cannot be said to have justifiably relied on them. *Dinardo v. City of New York*, 893 N.Y.S.2d 818, 820 (2009) (internal quotation marks omitted). Furthermore, vague assurances like the ones the ESU personnel allegedly gave here are insufficient to confer a special duty. *See id*. (holding that "vaguely worded statements"

assuring plaintiff that "'something' was being done" did not create a "special relationship" between defendant and plaintiff).

Therefore, the motion to dismiss the medical malpractice claim as against the City is GRANTED.

V.     **Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Defendants' motion to dismiss is GRANTED as to the following causes of action: (1) negligent hiring, training, and supervision on the part of the City; (2) supervisory liability claims against Defendants DiFrancesca, Hefner, McNamara, McCormack, Finbarr McCarthy, and Ramos; (3) claims of New York State statutory violations; (4) claims of negligence against the City; (5) false arrest; and (6) medical malpractice against the City. Defendants' motion to dismiss is DENIED with respect to: (1) claims against Defendants McCormack and Finbarr McCarthy for lack of personal involvement; (2) the *Monell* claim against the City; and (3) claims against the Individual Defendants for failure to intervene. Defendants' motion to dismiss the wrongful death claim is GRANTED, except Plaintiffs are granted leave to re-plead this claim within 20 days of the date of this order to cure the defect described herein.

SO ORDERED.

Dated:     September 25, 2017
             New York, New York

Vernon S. Broderick
United States District Judge