```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    ANTHONY ANDRE PAUL, et al.,

 4                    Plaintiffs,

 5            v.                          16 Civ. 1952 (VSB)(SN)

 6    CITY OF NEW YORK, et al.,
                                          Conference
 7                    Defendants.

 8    ------------------------------x
                                          New York, N.Y.
 9                                        March 13, 2019
                                          3:40 p.m.
10
      Before:
11
                          HON. SARAH NETBURN,
12
                                          Magistrate Judge
13

14                          APPEARANCES

15    THE COCHRAN FIRM
           Attorneys for Plaintiff
16    BY:  DEREK S. SELLS
           STEPHANIE R. CORREA
17

18    ZACHARY W. CARTER, Corporation Counsel
      For the City of New York
19         Attorneys for Defendants
      BY:  SUSAN P. SCHARFSTEIN
20

21    FURMAN KORNFELD & BRENNAN LLP
           Attorneys for Defendant New York City Health and      .
           Hospitals
22    BY:  PATRICK J. BRENNAN
           KAITLIN DRUMMOND
23

24

25
```

1              (Case called)

2              MR. SELLS:  Good afternoon, your Honor.  Derek Sells,

3    on behalf of Mr. Paul.

4              THE COURT:  Thank you.

5              MS. CORREA:  Good afternoon, your Honor.  Stephanie

6    Correa, on behalf of Mr. Paul.

7              THE COURT:  Thank you.

8              MS. SCHARFSTEIN:  Good afternoon, your Honor.  Susan

9    Scharfstein.  I represent the city and the ten individual

10   defendants.

11             THE COURT:  Thank you.

12             MR. BRENNAN:  Patrick Brennan for New York City Health

13   and Hospitals Corporation.  Good afternoon.

14             MS. DRUMMOND:  Good afternoon.  Kaitlin Drummond, also

15   for the New York City Health and Hospitals Corporation.

16             THE COURT:  Thank you.

17             Thank you all for coming in.  I have a series of

18   letters to be addressed today.  I have letters from the Cochran

19   firm dated February 26, February 28, and March 8.  And I have

20   letters from Corporation Counsel dated March 5 and March 12.  I

21   understand that there are a number of disputes largely focused

22   on the depositions going forward in this case.

23             So let's jump right in.  As I understand it, the

24   plaintiff is seeking four additional depositions from the 20

25   I've already authorized and it sounds like about a half a dozen

1    have been taken thus far.

2              Is that accurate, Mr. Sells?

3              MR. SELLS:  I don't think it's a half dozen, your

4    Honor, but we've taken a substantial number.  I don't know what

5    the exact number is.  I think if I go down the list, we've

6    taken Hefner, we've taken Smiddy.  Eight so far, your Honor.

7              THE COURT:  Half of a baker's dozen.

8              MR. SELLS:  We have a number of other ones coming up.

9              THE COURT:  OK.

10             So I authorized 20 depositions in September, I

11   believe, and I want to talk now about why you believe having

12   taken eight depositions that you can already contemplate that

13   you're going to need an additional four.  Some of the

14   depositions that you've listed have the potential at least to

15   be repetitive, some of them it's not entirely obvious to me why

16   you need them.  For instance, there are a number of people from

17   the hospital that you're seeking to depose regarding

18   observations of the decedent.  I'm not sure exactly what kind

19   of disputed evidence you need at that stage in the incident

20   that would justify taking, I think it's four depositions of

21   people at the hospital.  It seems to me that there are two EMTs

22   that you're seeking to depose from TransCare.  Again, it's not

23   obvious to me why you would need to take those depositions and

24   certainly not two of them, especially when you haven't taken

25   any yet and don't know whether or not you'll get clarity on

1   some of the issues.

2          So, do you have a basis for seeking to exceed the 20

3   depositions at this point?

4          MR. SELLS:  Yes, your Honor.

5          The reason that we need more depositions is because of

6   the investigation that was done in this case by FID.

7          THE COURT:  By FID, sorry.

8          MR. SELLS:  Yeah, so the Force Investigation Division.

9          Your Honor, I have a confidential document that has

10  been previously marked in depositions as Plaintiff's Exhibit 3

11  that I'd like to hand up to you.  The reason that we didn't

12  include it is because it's in part in response to the city's

13  last letter.  So what I want to be able to show your Honor is

14  why we need these depositions.  We believe that the Force

15  Investigation Division was responsible for covering up what

16  happened at the scene and also what happened at the hospital in

17  order to avoid liability on the part of the police officers

18  either criminal or civil.

19          And if I can explain, I think their report will show

20  this.

21          THE COURT:  Have you shown it to the defendants what

22  it is you're --

23          MR. SELLS:  I have copies that I can share with them,

24  although their copies won't be in color.

25          THE COURT:  That's OK.

1          MS. SCHARFSTEIN:  Thank you.

2          THE COURT:  You don't have an extra copy set, do you,

3     for my law clerk?

4          MR. SELLS:  I don't.  I'm sorry.

5          THE COURT:  That's OK.

6          MR. SELLS:  But if you go through their

7     investigation, it pretty much tries to describe what occurred

8     with my client in this incident.  So you see like you start off

9     and they say, oh, this happened July 1, and there was a call

10    regarding a barricaded EDP, he was on K2.  They believe he was

11    smoking K2.  And then ESU comes and if you flip through to, I

12    guess it's the front lobby area of 28 -- if I can just approach

13    a little bit.

14         THE COURT:  Yes.

15         MR. SELLS:  The front lobby area of 2846 Briggs

16    Avenue.  This is where my client's room was.  So ESU, they go

17    there and they hear my client banging, banging, banging on the

18    door for hours straight, just yelling, cursing and being

19    incoherent at times.  They call a hostage negotiator there, and

20    at some point they try and get some surveillance of them to see

21    what's going on.  They put multiple cameras into the room.

22    They're able to observe him naked, they claim, and at some

23    point they decided that they need to make a partial door breach

24    so they can put another camera in.

25         And they put a saw, they saw through the door, and

1    they say they cut my client with the saw.  At which point they

2    stopped the saw.  Then they say all this blood comes pouring

3    out from the door, so they believe my client was in an emergent

4    situation so that made them have to enter.  So they decided

5    that they were going to bust through the door.  And then two

6    Tasers, they claim, were deployed simultaneously against my

7    client.

8            If you look at the reports that the two officers who

9    used the Tasers that need, they filled out reports of their

10   Taser use, and both of them say that their Tasers worked, that

11   the prongs, because the way the Tasers work is when you fire

12   them from a distance, they have two prongs that go into the

13   person that they hit.  And when these two prongs go in, once

14   they go in, they form a circuit so that an electrical charge

15   then goes between the two prongs.  It's meant to shut down the

16   central nervous system.  So both of these otherwise on the

17   night that this happened say that they fired these prongs and

18   they get my client on to the ground.

19           They say that my client is covered in blood, that his

20   head, his face, every part of him is covered in blood.  And

21   that it's so bloody on the floor that they're slipping and it's

22   hard to get a handle on them.  So this is the narrative that

23   we've been given by the officers that we've deposed so far in

24   some of the records, including the records that come from FID

25   and their investigation.

1          They then, if you go further into the document, you'll

2     see that they show the equipment that was used, the saw with

3     the blade.  If you go through, you'll see like the saw where

4     they cut through the door and there's blood or what looks like

5     blood there, you see the cuts on my client's hands, right, to

6     make it seem as though, OK, he was cut.  But when you look at

7     the medical records, including the autopsy report, you'll see

8     that there wasn't really a blood vessel that was hit.  And

9     there wasn't that much blood that he lost.

10          And if you look at the autopsy photos that appear in

11     this document, you'll even see that my client is not covered in

12     blood at all, but when the crime scene search team gets to the

13     location, there's a bucket, there's a picture of a bucket that

14     looks like it's almost a quarter -- it's like a sizable bucket,

15     it looks like there's almost a quarter or more of a red

16     substance in it.  There's a mop that's pictured that looks like

17     it could have been used because there's red stuff on it.  There

18     is another bucket that has water in it with a rag in it and

19     there looks to be blood stains around that.

20          And there was a witness who was asleep in a back

21     bedroom during all of this.  And when ESU does a search, a

22     secondary search and they pull this witness out, he sees the

23     ESU people cleaning up what appears to him as cleaning up in

24     the room.  In fact, he says, Can I help you, in his own written

25     statement and he's ushered out.

1         ESU people testify that they're covered in blood, that

2    their equipment, everything is covered in blood as a result of

3    interacting with my client.  They say that after they do this,

4    they go back and they meet, they all meet at -- in the places

5    where the ESU comes out of is called truck 2, they all meet.

6    And they find out that my client dies.  And once they find out

7    that he dies, they start getting rid of their uniforms, the

8    ones that were covered in blood, they claim, they start getting

9    rid of them.  Some of them say they throw them away, some of

10   them say they washed it.  But we have real question as to

11   whether this is my client's blood because it doesn't match up

12   with the medical records.  He didn't lose that much blood.

13        So we want to know what happened to that bucket that

14   appears to have this red substance in it?  What happened to the

15   mop that appeared to have red substance on it?  What happened

16   to the pail that's depicted in the shower, in the bathroom of

17   my client's room that has a red tinge around it?  What happened

18   to all the blood that was on the floor, on the door, was it

19   ever tested?  Whose blood is it?  And we don't know because

20   it's not in the records.  There's nothing that says that this

21   blood was ever tested.  There's nothing that says that this

22   bucket was ever kept.

23        THE COURT:  None of that answers my question about why

24   you think today you need to depose four people at the hospital

25   or two people who were the TransCare EMTs.

1              MR. SELLS:  So the reason that we have these names is

2    because these people were either interviewed by this Force

3    Investigation Division or they were requested to have

4    interviews with the Force Investigation Division.  One person

5    testified -- or not testified, but told force investigation

6    that when my client was brought into the hospital, he appeared

7    to be unconscious and not moving.  He was then reinterviewed

8    three weeks later by the Force Investigation Division and he

9    told a completely different story saying that my client was

10   combative and resistant to attempts to get assistance, medical

11   assistance.

12             Another of the witnesses, and this is Ms. Robinson,

13   refused to testify without having her representative present.

14   Another witness also testified that, yeah, when he came in,

15   didn't look like he was moving.  But if you look at what nurse

16   Matera says, she says that my client was combative during the

17   time that he was in the emergency room.  Dr. Silverberg says

18   that he tried to bite people in the emergency room.  Even

19   though no one else says it, Dr. Silverberg says that he tried

20   to bite someone.

21             The two police officers who accompanied Mr. Paul to

22   the hospital, right, because they with respect to ESU, but they

23   came with him in the ambulance ride, they describe when --

24   well, one of them describes Mr. Paul as not speaking, that the

25   only combative gesture he made was he raised his arm, and that

1   when he got to the hospital he was still in cuffs and he was

2   strapped down not really resisting at the hospital.

3          So there's a dispute among and between these witnesses

4   as to what happened, but we do know that FID, when they

5   interviewed, I think it was Goulart, when they interviewed

6   Goulart, they first interviewed him, I believe it's on the day

7   that the incident occurred, but then they go and speak with

8   him, I think it's a couple of weeks later, he gives a

9   completely different story. So we want to be able to get from

10  these witnesses their version of events under oath because

11  they're so conflicting. And that goes to, again, the standard

12  of care that should have been given to him based upon what

13  these folks are saying.

14         THE COURT:  Can I ask you a related question?

15         MR. SELLS:  Sure.

16         THE COURT:  My read of your complaint is that your

17  only *Monell* claim relates to the city's practices and policies

18  related to EDPs, and that you don't have a *Monell* claim related

19  to the use of the Taser, that you have an excessive force claim

20  related to the Taser use but not a *Monell* claim.

21         Is that correct?

22         MR. SELLS:  Well, our *Monell* claim is based upon the

23  use of excessive force against isolated and contained EDPs.

24  And the excessive use of force can relate to Tasers as well as

25  other weapons, but in this particular case, we have certainly

1    violations of the Taser policy that existed in 2015 with

2    respect to what happened with Mr. Paul.

3              THE COURT:  But why do you need to have a history and

4    training and the types of *Monell* discovery one normally seeks

5    in connection with Tasers.  It seems to me you're entitled to

6    know what the policy was related to Tasers at the time of

7    Mr. Paul's death and whether or not what was the training

8    material that the defendant -- defendant officers received to

9    see whether or not they acted in compliance with that which

10   would, I think be relevant to whether or not they were acting

11   with excessive force.

12             MR. SELLS:  If I could take you to this page.

13             THE COURT:  I'm sorry.  If I could finish my sentence.

14             MR. SELLS:  Oh, I'm sorry.

15             THE COURT:  But it doesn't seem to me that the long

16   list of notice topics related to Tasers is really relevant here

17   and, particularly, going back years and years before your

18   client's death.

19             MR. SELLS:  If you could go to this page, the ESU

20   Taser page that has the red asterisk next to DiFranchesla's

21   name.  So as I had mentioned before, the early morning that my

22   client was Tasered by DiFranchesla and McNamara, both of those

23   officers wrote reports saying that the Taser prongs went in and

24   that the Tasers worked.  These reports were signed off on by

25   two other supervising ESU officers who also went into

1     Mr. Paul's apartment that night.

2            Now, Mr. Paul was naked.  All of these officers that

3     have testified so far said that they were able to observe

4     Mr. Paul after he was Tasered laying on the ground.  So they

5     could see the Taser prongs.  There's a picture in the very next

6     page of this exhibit shows where the three Taser prongs that

7     were found on Mr. Paul's body.  Only three were found on his

8     body.  So what the FID did was they suggested -- even though

9     the officers both wrote reports saying that the Taser prongs

10    were in and that the Tasers worked, one of the Taser prongs was

11    no longer in Mr. Paul's body by the time he got either to the

12    hospital or to the morgue.  And so what FID did was they

13    claimed that one of the Tasers did not work because the two

14    Taser prongs weren't in his body.

15           So what we want is to know where the Taser prongs are,

16    because there were four Taser prongs.  We've only seen three,

17    where's the fourth one.  If you look at the crime scene search,

18    there's no prong.  They didn't find any prong.  There's no

19    prong in the ambulance, there's no prong at the hospital.  What

20    happened to the fourth prong?

21           So the other thing, your Honor, is with these Taser

22    prongs, there are wires that attach to a cartridge.  So when

23    the Tasers fire, not only do the Taser prongs go in, but the

24    wires go in.  Those wires are not supposed to be removed from

25    the prongs because if the wires are removed in the process of

1    removing the prongs, a prong could come out.  Now, what we know

2    is based upon the autopsy report.  Dr. Smiddy found a puncture

3    wound to Mr. Paul's neck where there was no Taser prong, OK?

4    This puncture wound was not caused at the hospital, because

5    there was no intervention in the medical records that showed

6    any type of needle going into Mr. Paul's neck.  So we believe

7    that that was a Taser prong.

8           Now, we need to have the protocols on how the Tasers,

9    the Taser prongs, the cartridges and the wires, what was the

10   protocol on how they were supposed to be collected?  What was

11   the protocol on how they were supposed to be tested, and we

12   need to know all the things that we're asking for so that we

13   can determine whether or not procedures were violated in the

14   way that this investigation was conducted because we have no

15   information, we have absolutely no information about the wires,

16   the Taser prongs, the cartridges, and we have not seen the

17   Tasers.

18          The next thing that you see is that they have a time.

19   If you go back to this page, they list the times that the

20   Tasers were allegedly fired.  OK?  But what it doesn't tell you

21   is that those times were manipulated.  And I'm going to show

22   you another document.

23          THE COURT:  Can I stop you for one second.  We're not

24   trying the case right now.  We're having a conversation whether

25   you should take 24 depositions or 20 depositions, and I want to

 1    bring you back to the issue in dispute.  I'm not here to learn

 2    your entire case.  And so if you've got a document that's going

 3    to explain to me why I should rule now that you're entitled to

 4    24 depositions, I'm happy to hear from you, but I feel like

 5    we're getting a little bit far afield.

 6              MR. SELLS:  I thought you asked about the 30(b)(6)

 7    topics, because I'm trying to get into why we should be able to

 8    talk about all the things that we want to talk about with

 9    regard to the 30(b)(6) witnesses.

10              THE COURT:  My question for you is first why you

11    should be making decisions now that you need an additional four

12    from what I was already ruled, and I asked questions about the

13    policies behind seeking sort of years in advance of the

14    incident the policy and what you've told me is that you need to

15    know sort of what was going on on July 1, 2015 with respect to

16    the use of Tasers and how they were discharged, whether people

17    were allowed to pull the wires, how they were stored, that sort

18    of information, but you haven't yet answered questions about

19    discipline and training of ESU officers who violate Taser

20    policy, substantiated allegations about Taser policy.  I don't

21    know why you're entitled to all of that.

22              MR. SELLS:  Again, it goes to the issue of excessive

23    force.  If there's no discipline for officers that violate

24    what's prohibited use of a Taser, for example, in this case

25    there was a prohibition of two officers simultaneously using

1    Tasers against one person at a time.  There was also a policy

2    that prohibited any more than three Taser cycles being used

3    against an individual at one time.  Here there were 13.  And so

4    the idea that these policies were broken and that there was a

5    history of these policy policies, the reasons that these

6    policies were given or were in place, and then that there was

7    no discipline issued against an officer who violated these

8    policies, would lend itself to proving our claim, that this was

9    No. 1, an intentional act, No. 2, that it was done as a method

10   of essentially torture, that it was excessive, in that it would

11   subject the city or these individuals to liability personally

12   for punitive damages.

13          And so if we need to have that whole background so we

14   can show that these officers knew about these policies or

15   should have known about these policies and didn't follow them

16   intentionally.

17          THE COURT:  All right.  Let me give Ms. Scharfstein an

18   opportunity to respond.

19          MR. SELLS:  If I could, your Honor, because I think

20   this is a very important part in terms of the Tasers.  So if I

21   could just hand you, I'll pass these around, if I can just hand

22   you the Taser record, you'll see that -- and if I could just

23   direct your attention to the second page first.

24          THE COURT:  I'm not going to have these marked as

25   court exhibits because I understand that they're confidential.

1    So I'll look at them, but they're not going to be part of the

2    record.

3            Everybody agrees?

4            MS. SCHARFSTEIN:  Yes, your Honor.

5            MR. BRENNAN:  Yes, your Honor.

6            MR. SELLS:  Your Honor, if you go to the second page,

7    you can see that this is not the handwritten portion of it, but

8    the typewritten portion is the actual readout from the Taser.

9    So for this one Taser, you can see starting at 0012, these are

10   the times that the Taser was fired against Mr. Paul according

11   to the Taser itself because the Taser has an internal clock

12   where it tells you the time and the date and the duration of

13   the charge.

14           And if you look, you can see, for example this Taser

15   fired at 29:42 and these cycle goes for five seconds.  So the

16   next one is at 29:49.  So seven seconds later.  And then 29:55,

17   30:01, 30:08, then 30:17.  That's what the Taser says.  Now,

18   that was for one Taser.

19           If you go to the second Taser, and this one will be --

20   the second to the last page, again, if you ignore the

21   handwritten portion and whatever was written in red, if you

22   just look at the time that the Taser itself printed out, it

23   says that the Taser fired at 34:25, 34:31, 34:37, 34:33, and so

24   on.  So if you go by what the Taser says, this Taser was fired

25   five minutes after the first Taser.  The ESU officers

1    testified -- when Mr. Paul was on the ground, he was in cuffs

2    within 20 seconds of the first Taser.  So now you have five

3    minutes later, he's being Tased another six times or seven

4    times.

5          So somehow when you get back to that FID document, it

6    says that those Tasers were fired simultaneously.  It doesn't

7    account for this five-minute delay that the actual Taser

8    readout says.  So the question comes, under what circumstances

9    can you push back the time -- the internal time of a Taser to

10   make it appear as if it fired at a different time?  And what is

11   the maintenance of it?  How do you know that the Taser is not

12   on the same -- it's working on same time that the Taser says

13   it's working on?

14         So this is the kind of thing that we have no

15   explanation for based upon the records that we've seen.  All we

16   see is this handwritten stuff that says, oh, you know,  the red

17   says when the Tasers were and you see something that says

18   synced on the first page, it says synced, but we need to get

19   behind that and figure out how it happened, who did it.

20         And at this point, we don't know, so we attempted to

21   get this information from the person who put together this

22   PowerPoint, the FID PowerPoint, that was Detective Beelitz.

23   He's the one that put this together.  But then when we

24   questioned him, he didn't have any knowledge about the

25   substance of what he put together.  He just said Chief Sprague

 1  told him to do it, so he did it.  So he turned out, as the city

 2  correctly states, to be a witness with no helpful information,

 3  he just said that, you know, Sprague told him to do it.  That's

 4  why we have all these FDNY people because we don't know FID

 5  people, we don't know based on the records who did what, we

 6  don't know who synched, we don't know who wrote this stuff up,

 7  we don't know how all the sudden that one Taser operated and

 8  the other one didn't.

 9          THE COURT:  I understand your argument.

10          Let me hear from Ms. Scharfstein.

11          MS. SCHARFSTEIN:  Thank you, your Honor.

12          I hope it will suffice to say that I disagree with

13  many of the statements that Mr. Sells has made, I don't

14  necessarily think there's an evidentiary basis for it, but

15  since, as your Honor has pointed out, we're not here to argue

16  the merits of the case, I would just prefer to leave it at that

17  and not address it point by point and just address the question

18  about the discovery issue.

19          THE COURT:  Sure.

20          MS. SCHARFSTEIN:  So my thinking on that is that there

21  may be some miscommunications or misconceptions here.  And what

22  I am hoping to do, what I would like to do very much is to

23  sequences the depositions so Mr. Sells gets the answers to the

24  questions he needs and we can certainly have someone explain

25  this document to him, and to do that in a way that may make

1    other depositions that he now thinks are necessary unnecessary.

2    So that's really my point with regard to the depositions, that

3    it's really premature for him to decide he needs multiple

4    investigators.

5         He wanted Detective Beelitz's deposition.  We at the

6    city wanted to cooperate in discovery.  I strongly suspected it

7    was not going to be productive.  Detective Beelitz had a very

8    limited role.  He has a lot of knowledge about how to put

9    together the PowerPoint presentations and that's exactly what

10   he did, he took information that was provided by other people

11   that he had no knowledge of and he put it in the form of a

12   PowerPoint presentation.  This was intended to be an executive

13   briefing about maybe 14, 15 days after the incident.  It was

14   expressly made based on preliminary information and that's all

15   it was.  We don't even have the full presentation here.  I

16   gather that Mr. Sells printed out the paper, but there is some

17   additional information behind it because it's more in the

18   nature of a little film than really a two-dimensional

19   presentation.  So there are some other pieces to it, but just

20   so you're aware, but I don't think that's really the point

21   here.

22        I guess I would make two suggestions as to how this

23   may be resolved going forward more satisfactorily to all sides.

24   And one is that we sequence the depositions in a way that makes

25   sense and the other is that I would hope that Mr. Sells would

1  make more of an effort to make the time productive and to ask

2  questions of the witnesses rather than trying to box them into

3  some sort of admission that doesn't make any sense, because

4  many of the topics that he's asking about are really beyond the

5  scope of the particular witness's knowledge.  I think that if

6  we were somehow able to do that, we would get through the

7  depositions more quickly, Mr. Sells would have more in the way

8  of the answers that he needs, and we would be able to complete

9  this whole process expeditiously.

10          And my concern is that if Mr. Sells starts with the

11  premise that there was some kind of coverup and that

12  depositions and additional discovery is needed to illuminate

13  these apparent inconsistencies and people's motives and why

14  different witnesses may have said different things, there will

15  be no end to it, because there will always be some other piece

16  of information out there or some other deposition to be taken

17  that might somehow lend credibility in his view to the fact

18  that there was some sort of coverup.  All of that, if anything,

19  relates to what happened after the incident.  It doesn't relate

20  to the basic facts as to what happened at the scene, what the

21  officers saw, what they knew, what they were informed by others

22  and how that affected what steps that they took to resolve the

23  incident.  And that's really the centerpiece of this case, and

24  I would hope that the parties and the Court could focus on

25  that.

1        THE COURT:  Do you want to speak as to the 30(b)(6)

2   issue?

3        MS. SCHARFSTEIN:  On the Tasers, I mean, I think that

4   we've been willing to produce a witness.  There are some

5   concepts that may not be available to an attorney who's not

6   Taser trained.  It's really the scope of the deposition that

7   we're objecting to and the fact that it really goes beyond any

8   issues in the case.  If, for example, he needed a witness to

9   explain this particular document which relates specifically to

10  this case, I think we could do that.  Again, it's really the

11  scope of the two depositions, 30(b)(6) depositions that really

12  go far beyond this.  Your Honor said the discipline, the

13  allegations, they have nothing to do with what the officers

14  knew at the time.  Certainly if the officers were aware of some

15  incident where it was believed that some officer overstepped

16  and wasn't disciplined properly, I mean, if the officer knew

17  about it, that could be a subject of inquiry at that officer's

18  deposition.

19        There's no reason, in my view, to have a

20  representative of the city try to manually review hundreds or

21  thousands of files to try to isolate matters that the Court may

22  decide properly relate to this case when there really isn't a

23  *Monell* claim.  My understanding is the *Monell* claim relates --

24  is specifically based on that memoranda from the other case

25  that had to do with partial door breaches, and that's the way

1    it's pled in the complaint.

2           THE COURT:  Do you want to speak about your

3    objections, if any, as to the notice topics for the EDP

4    30(b)(6)?  I know there's an objection about timing.  But other

5    than that, do you want to speak to any issues with respect to

6    those topics?

7           MS. SCHARFSTEIN:  Well, I think that I pretty much

8    said it in my letter.  I could highlight those points, but I

9    think that -- I mean, we did one that limited to the emergency

10   services unit and I think they agreed to that.

11           I think that some of the topics as written are kind of

12   off because with regard to the supervision and chain of

13   command, I don't really think we have that.  I mean, there's

14   certainly a patrol guide provision that addresses how EDPs

15   should be handled and some of that applies to ESU.  I guess my

16   primary concern was that the topics are written so broadly that

17   they don't really address the specific situation we have here.

18   And I think I gave the example of how you handle an EDP on an

19   elevated surface or on the top of a bridge brings into a lot of

20   considerations that aren't present here.  So it really should

21   be limited to the scope of the type of issue that was presented

22   here, the circumstances that were presented here.

23           THE COURT:  Mr. Sells, you didn't really get a chance

24   to speak about the EDP 30(b)(6) notice.  Do you want to address

25   that?  Maybe I'll begin by asking you a question, which is I

1  understand that you are prepared to limit notice topics 1 and 3

2  to three years back from the date of the incident.

3          MR. SELLS:  Correct.

4          THE COURT:  I guess that would get us to July 1, 2012.

5          Why don't you tell me why you think you need to go ten

6  years back for notice topics two, four, and five.

7          MR. SELLS:  Because I think, your Honor, what prompted

8  the NYPD to look at their EDP protocol was Eleanor Bumpurs

9  case.  So that was well more than three years ago.  And in that

10  case there was an EDP who ended up being killed by police.

11          THE COURT:  When did that take place?

12          MR. SELLS:  I don't remember the exact year.

13          MR. BRENNAN:  Early 1980s, your Honor.

14          MR. SELLS:  So that's where it started, but then there

15  was an evolution of the protocols, how to handle an isolated

16  and contained emotionally disturbed person.  And the *Bah* memo,

17  which your Honor reviewed prior to it being disclosed, makes

18  reference to multiple times where ESU had an isolated and

19  contained EDP, decided to make a partial door breach and then

20  once the door was breached, it resulted in the ESU having to

21  use force to deal with the emotionally disturbed person.

22          And the conclusion was, if the door is never breached,

23  you don't have this problem, but the *Bah* memo itself talks

24  about prior instances where this occurred.  So we want to know

25  what those prior instances were.  And I'm not talking about

1    elevated surfaces.  The *Bah* memo itself speaks to isolated and

2    contained EDPs that ESU disturbed by going into their space.

3              THE COURT:  But your topics two, four, and five aren't

4    limited to isolated and contained.

5              MR. SELLS:  We're willing to do that.  We're willing

6    to do that, your Honor.  We're willing to limit it to just

7    isolated and contained EDPs.  And certainly when Chief Banks

8    wrote that memo, he made specific reference to multiple

9    occasions where isolated and contained EDPs were engaged by ESU

10   because ESU made a partial door breach.

11             THE COURT:  Thank you.

12             With respect to --

13             MS. SCHARFSTEIN:  Can I just respond to that?

14             THE COURT:  Sure.

15             MS. SCHARFSTEIN:  I just wanted to make clear, there's

16   no evidentiary basis here to say that this incident involved a

17   partial door breach.  *Bah* spoke of partial door breeches.  This

18   case involved no opening of a door, it was cutting of a hole

19   and that's what led to the emergency and that's what led to the

20   full entry, so it was not a partial door breach.

21             In addition to which, those other incidents, I thought

22   I pointed this out in my letter, but those other incidents are

23   a whole variety of circumstances, not necessarily related to

24   those here.  So the *Morales* case was an EDP above -- on top of

25   an elevated surface.  Some of those other cases involved full

1    door breaches.  In the *Bumpurs* case, the officers went into the

2    apartment and there were revisions to the procedures then at

3    that point, but not necessarily related to those here.

4              So the point is that the procedures that were followed

5    here were the ones that were appropriate for this incident.

6    And our view is there's no need to go back further than three

7    years because those prior revisions are not necessarily related

8    to this, and three years should be enough of a window to

9    determine whether things have been happening over a period of

10   time such that the city should have been on notice that some

11   additional training was necessary.

12             I mean, I think I went through all of those incidents

13   in my first letter, which would have been March 5, and was it

14   March 5.  Yeah, it was, some of those incidents were street

15   encounters that had nothing to do with partial door breaches,

16   which this case wasn't even, and five of the incidents were not

17   ESU involved at all.

18             THE COURT:  Thank you.

19             MR. BRENNAN:  Your Honor, one thing.

20             THE COURT:  Yes, sir.

21             MR. BRENNAN:  May I address the issue about the

22   depositions of the hospital police officers.

23             THE COURT:  Of course.

24             MR. BRENNAN:  They're employees of New York City

25   Health and Hospitals Corporation.  We've produced the emergency

1   room physician, Dr. Silverberg.  We spent eight or so, nine

2   hours with him.  His deposition is not done.  That will be

3   completed Friday this week.  We have agreed to produce the

4   emergency room nurse.

5         We got this request for three different hospital

6   police officers, two officers and a sergeant.  The first,

7   Officer Frazier, we were advised is out on sick leave.  He had

8   a medical illness.  We were told he would not be able to give a

9   deposition.  If any further information is needed, I'll have to

10  get information from Officer Frazier and a HIPAA disclosure so

11  I can say what wrong with him, but at this time he's not

12  available.

13        The other two, Sergeant Goulart and Officer Robinson

14  are available.  I agree they're fact witnesses, but just to put

15  their role in perspective, Mr. Paul came into the emergency

16  room on proper on 1 a.m. on July 2, 2015.  At 1:20 his heart

17  stopped.  He stopped breathing and his heart stopped and he

18  was -- an effort was made for 19 minutes to resuscitate him,

19  but he could not be resuscitated.  He was pronounced dead at

20  1:39.  The officers were called at about 1:05 a.m. to assist

21  the hospital staff because Mr. Paul was agitated and combative,

22  he was handcuffed as they were trying to transfer him from an

23  EMS gurney on to a hospital stretcher.  They couldn't do that

24  because he was a big, strong person and he was agitated and was

25  fighting with them.

1          So the officers are relevant to that part of the case

2     because they had observations consistent with what everyone had

3     documented in the record.  And to the extent that there may be

4     some police interview notes or records out there that are

5     inconsistent, the witnesses are going to say that the officer

6     who took that information down got it all wrong.  They are

7     witnesses to events here.  So I didn't oppose the request to

8     produce them, but I do request there be some limits as to the

9     time that's spent with these witnesses.

10         For many of the depositions so far, we've started the

11    deposition day at 10 a.m., we've taken an hour break largely at

12    Mr. Sells insistence that we take numerous breaks during them,

13    and some of them go well into the evening.  For instance, the

14    medical examiner, Dr. Smiddy went from 10:30 a.m. to about

15    8 p.m. last week.  These witnesses, the police officer

16    witnesses from the hospital, I can't imagine any need to

17    question them for seven hours.  And in order to meet this

18    deadline of completing this fact discovery by the end of March,

19    I think it would be reasonable to impose some stricter time

20    limits for them so we can get all this accomplished.

21         THE COURT:  Understood.  Thank you.

22         Let me begin with the request to extend the number of

23    depositions to 24.  At this point I'm denying that request.

24    It's without prejudice.  If you come to me and can make a

25    detailed showing as to why an individual deposition will have

unique information that you were unable to get from any of the

20 depositions that you've taken, then I'll entertain the

request, but 20 depositions is a significant number, and leave

it to the parties.  I think generally you have all gotten along

reasonably well, at least compared to some of my other cases.

Maybe if there is one additional deposition that's necessary,

maybe as a courtesy, it will be extended, but the periods of

time should work together and do their best to keep the

depositions to 20.

         And Mr. Sells, you should work with your adversaries

to stage these in whatever way is appropriate.  I'm not going

to direct you to take one deposition over another.  I'll

obviously leave that to your good judgment, but to the extent

you can glean information about people who might have more

information than others, you should speak with your adversaries

and see whether or not certain depositions should be

front-loaded or certain individuals as between two should go

first.

         With respect to the sort of general requests about

these depositions, you are all officers of the court.  I expect

everybody to behave appropriately during depositions.  Nothing

specific has been brought to my attention to make me think that

Mr. Sells or anybody from his office is conducting depositions

in a manner that is hazard harassing or improper.  Obviously

those depositions should be as efficient as possible.  You're

1   taking the time of law enforcement and medical officials away

2   from their jobs. So you should make these deposition as

3   efficient as possible, but I'm not going to limit the amount of

4   time beyond what the rules already limit, nor am I going to

5   limit the manner of questioning. I know, Ms. Scharfstein, you

6   made a reference to trying to box in witnesses, but depositions

7   generally serve two purposes: To gather information and to try

8   and lock witnesses down to certain testimony. So Mr. Sells and

9   his cocounsel are free to ask whatever appropriate questions

10  they seek to ask. I'm not going to limit the ways in which he

11  conducts those depositions.

12          In addition, with respect to the request that

13  non-party depositions take place in the city's offices, I'm

14  also going to reject that request. Again, nothing has been

15  told to me to make this case anything outside of the ordinary

16  way of course. So typically a deposition that's noticed by one

17  party takes place at the noticing party's officer. So I'm not

18  going to limit it in any way.

19          With respect to the 30(b)(6) witnesses, it sounds like

20  with respect to the EDP notice on the consent of the

21  plaintiffs, those notice topics one and three will be limited

22  to three years back and all of the notice topics will be

23  narrowed to limit just to isolated and contained EDPs. So

24  certain of these notice topics are not specific to that and

25  they should be amended to reflect that.

1          With respect to notice topics two, four, and five,

2     I'll authorize and direct that the witness be prepared to speak

3     to incidents that go five years back from the date of the Paul

4     incident, ten years back seems to me excessive, but I will

5     grant five years back.

6          With respect to the notice topics for the Taser

7     witness, it seems to me that a number of these topics are not

8     appropriate for this case.  Specifically topics related to the

9     history and practices of the NYPD with respect to Tasers,

10    studies and surveys that are compiled, discipline of other

11    officers, substantiated allegations against officers.  It seems

12    to me, as you've pointed out, Mr. Sells, that what you're

13    interested in was what the policy was at the time of this

14    incident, how Taser usage is recorded and whether or not it can

15    be manipulated in any way, whether or not the report that you

16    provided to me is accurate, questions about the prongs and the

17    missing fourth prong, those sorts of questions seem appropriate

18    to me.

19         The questions that relate to policy and practices of

20    Taser use generally going back historically, and questions

21    related to allegations of misconduct by other officers in

22    connection with Taser use I think is not appropriate.  Your

23    Taser claim focuses just on excessive force, as I understand

24    it.  And so going into what I consider *Monell* discovery for

25    that issue is not appropriate.

1           I think that leaves us just with this issue with

2    respect to the cell phone.  Here's what I think is appropriate.

3    And based on my extensive work in authorizing these types of

4    quarter notice criminal docket, I have a fairly good idea of

5    what can be produced.  So you can request a service provider to

6    provide you with just the phone numbers that are contacted,

7    people call these trap-and-trace orders.  So just what phone

8    numbers were contacted during a particular period of time.  And

9    as I understand it, we're talking about a few hours at the

10   relevant day.  So an appropriate order can be issued to the

11   service provider requesting just the numbers that communicated.

12          And you can get information about numbers that

13   communicated as far as phone calls.  I believe you can even

14   find out whether it was a phone call or a voice message that

15   was left, and whether or not there was a text or some sort of

16   instant messages going back and forth whether through

17   Blackberry or through iPhones without receiving any content.

18          So in the first instance, the appropriate subpoena

19   should be just for the phone numbers.  As I understand it,

20   there's a question about whether or not one officer called a

21   supervisor.  I believe that's the disputed issue and there's an

22   open question of whether or not that even happened.  Let's

23   first find out whether or not there's contact between the

24   relevant phone and the receiving phone and then we can go from

25   there.  And if we can see whether or not it's a text or

1    something, we can have further conversations about whether or

2    not the provider should be ordered to produce that information

3    as well.

4           I'll also note based on my experience, that if a

5    preservation request hasn't been made to the provider that

6    should accompany this request.  So that if, ultimately, we can

7    see that the two relevant people were texting each other, we

8    want to get those texts, we want to make sure that's preserved

9    at least starting now.  But in the first instance, just the

10   contact numbers should be produced and we can go from there.

11          Any questions on that?

12          MR. SELLS:  No.

13          THE COURT:  I think that addresses all of our

14   outstanding issues.  I'll note that it's March 13.  You have

15   two weeks, I think, to complete all of your depositions.

16          Is that going to happen?

17          MR. SELLS:  No, your Honor.  I can assure you that it

18   will not.

19          And so that was one of the things that we wanted to

20   raise as well, whether or not we can get an extension of the

21   fact discovery deadline as well as the notice period for

22   identifying our experts.  So if we can push those back.

23          I would also ask, your Honor, I know you're limiting

24   us to 20, but can we get a Mulligan on the B list depositions.

25   We both agree that was a know-nothing witness as far as this

1   case goes.

2           THE COURT:  The problem with Mulligans, as a mother

3   and spouse of a golf player is that once you give one, it seems

4   people want them repeatedly.  Why don't you move forward with

5   the 20 and see what you can do.  And I'm sure Ms. Scharfstein

6   will be reasonable if there's appropriate basis.

7           I will also say, and I'm not directing you to take

8   your depositions in fewer than seven hours, but to the extent

9   that you can agree to take two depositions in seven hours,

10  maybe you can horse trade a little bit.

11          MR. SELLS:  I can tell you that Beelitz, that had to

12  be like two hours.

13          THE COURT:  Let me also make one request, let's keep

14  these depositions in the window from 9 a.m. to 7 p.m., unless

15  the witness is requesting an accommodation because of the

16  witness's schedule, but otherwise 9:00 to 7:00 gives everybody

17  enough time to conduct a seven-hour deposition and take

18  whatever appropriate breaks are necessary.  Let's keep these

19  breaks short.  No one needs to have a full course lunch.  I'm

20  sure everybody's eager to move this case forward and get back

21  to their other work as well.  But let's make that a reasonable

22  bookend so we're not having late starting depositions that end

23  up going into 8:30, 9:00 at night.

24          Mr. Sells, what are you proposing to me as a

25  reasonable request to extend discovery?

1          MR. SELLS:  Your Honor, to me I would ask that the

2     Court give us until maybe the middle of May.

3          THE COURT:  The middle of May.

4          MR. SELLS:  Yes.

5          THE COURT:  From defense table, any objections to

6     that?

7          MS. SCHARFSTEIN:  Your Honor, I understood that

8     plaintiff's counsel was going to be unavailable the first week

9     in April.  I don't know that it can't be done by the middle of

10    May.  And, in fact, in the interest of full disclosure, I have

11    been hunting for many months for some civilian witnesses I

12    would like to take as well and they have eluded me, so I would

13    like to continue with that process.

14          But I also want Mr. Sells to have some breathing room,

15    so, as I said, he can sequence the depositions in a way that

16    makes sense and that we're not locked into doing more than is

17    necessary because we are stuck with witnesses' availability or

18    counsel's availability.  And I think so far what we've been

19    doing is trying to go forward on whatever date it is that all

20    of the necessary parties are available, and that's why Beelitz

21    went first.  And I don't know if that's turned out to be the

22    most productive in retrospect.

23          THE COURT:  Let's set the close of fact discovery as

24    May 24.  That gives you all more than two months, which should

25    be adequate time.  I'm not going to extend that again, so get

1  your work done within that period of time.

2        I will set the deadline for expert disclosures to be

3  June 14, any rebuttal reports to be served on July 12, and

4  let's complete all expert discovery and depositions on

5  August 2.

6        MS. SCHARFSTEIN:  We were supposed to get notice

7  sooner of who the plaintiffs would be using their areas of

8  expertise and a brief description of the subject matter.  That

9  date was supposed to be April 1.  I don't know that it needs to

10 be, but the reason that the schedule was structured in that way

11 was because to get experts at the city, I need a window of time

12 to get pre-approval.

13        THE COURT:  Can you disclose by May 15?

14        MR. SELLS:  I think we can, your Honor.

15        THE COURT:  Let's make May 15 a deadline for

16 disclosing experts and that report will then be due June 14.

17 So it's a month beforehand.

18        Before we adjourn, let me encourage the parties to

19 continue working together to try and resolve these disputes.

20 Obviously you can bring things to my attention as you see fit

21 after an appropriate meet and confer.

22        I'll just mention briefly the issue of settlement.  I

23 don't know whether or not the parties have had any serious

24 settlement discussion.  I will tell you that, one, I'm very

25 busy, so if you want to have a settlement conference with me,

1   my schedule books up pretty quickly.  So if you ask me today

2   for a settlement conference, I'd probably give you a date in

3   May.

4           No. 2, in the summer everybody is busy and I'm not an

5   exception to that rule.  So if you think you might want to have

6   a settlement conference with the Court, maybe after the close

7   of fact discovery and maybe even before expert discovery

8   happens, now would be a good time to get in my calendar for

9   some time in late May or early June.  I actually think that

10  window is already pretty busy, but I would speak with my deputy

11  if you're interested.  Or if you think you want to come in

12  after the end of expert discovery when the parties have really

13  fully fleshed out their case, but before you invest in summary

14  judgment motions, you have a little bit more time to make those

15  requests, but probably August will be a bad time for you to

16  come in based on my schedule and your own schedule.

17          So let me just keep that topic at the front of your

18  consideration, and if you do want to come in after the close of

19  fact discovery but before expert discovery, now is the time to

20  get on my calendar.

21          Thank you very much everybody.

22          (Adjourned)

23

24

25