UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                              :

ANTHONY ANDRE PAUL and ALBERTY  :
PAUL, as co-Administrators of the Estate of  :
ANTHONY ANDRE PAUL II, Deceased    :
                              :               16-CV-1952 (VSB)
                    Plaintiffs,  :
                              :          **OPINION AND ORDER**
          -v-             :
                              :
THE CITY OF NEW YORK, et. al.       :
                              :
                  Defendants.  :
                              :
-----------------------------------------------------------X

Appearances:

Tracey Lyn Brown
Derek S. Sells
The Cochran Firm
New York, NY
*Counsel for Plaintiffs*

Susan P. Scharfstein
Stephanie Marie Breslow
New York City Law Department
New York, NY
*Counsel for Defendants City of New York, Sergeant O'Doherty, Lieutenant Licitra, Detective DiFrancesca, Deputy Chief Giordano, Captain McCarthy, Detective Hefner, Police Officer Ramos, Detective McNamara, Detective McCormack, Detective McCarthy, and Sergeant O'Doherty*

Patrick J. Brennan
Kaitlin Stavnitsky Drummond
Furman Kornfeld & Brennan LLP
New York, NY
*Counsel for Defendants North Central Bronx Hospital and New York City Health and Hospitals Corporation*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff, the estate of Anthony Andre Paul II, deceased, (the "Estate"), brings this action

under 42 U.S.C. § 1983, ("§ 1983"), against the North Central Bronx Hospital, New York City

Health and Hospitals Corporation (the "Hospital Defendants"), Deputy Chief Vincent Giordano, Captain Eugene McCarthy, Lieutenant Michael Licitra, Detective Anthony DiFrancesca, Detective Richard Hefner, Police Officer Aramis Ramos, Detective Darren McNamara, Detective Andrew McCormack, Detective Finbarr McCarthy, and Sergeant Kevin O'Doherty (the "Individual Defendants"), and the City of New York (the "City") (collectively with the Individual Defendants, the "City Defendants"). Currently pending before me are summary judgment motions and motions to preclude certain evidence filed by the Hospital Defendants and the City Defendants. For the reasons explained below, the City Defendants' motion for summary judgment is GRANTED in part and DENIED in part; the Hospital Defendants' motion for summary judgment is DENIED; the City Defendants' motion to exclude Walter Signorelli is GRANTED IN PART and DENIED IN PART; the City Defendants' motion to exclude the New York City Police Department ("NYPD") Patrol Guide and other internal materials is DENIED; the Hospital Defendants' motion to exclude computations of damages is DENIED; and the Hospital Defendants' motion to exclude testimony by Dr. Evan Cohen is DENIED.

## I.    **Factual Background**[1]

On July 1, 2015, Anthony Andre Paul II ("Paul") resided in a shared apartment on the first floor in apartment 1B of Freedom House #19 ("Freedom House"), a three-quarter house located at 2846 Briggs Avenue in the Bronx operated by Narco Freedom, Inc. (Doc. 287 ¶¶ 23, 46–47.) Residents of Freedom House were required to sign an agreement confirming they would abide by the rules, including a rule that staff were permitted to enter the residents' apartments at any time, without notice. (*Id.* ¶¶ 30–31.)

---

[1] This section is drawn from the parties' Rule 56.1 submissions in order to provide background and context for the cross-motions for summary judgment and is not intended as a recitation of all material undisputed facts. Unless otherwise indicated, the facts set forth in this section are undisputed.

On July 1, 2015, one of Paul's roommates observed him acting strangely and speaking "in tongues" as though he were possessed.  (*Id.* ¶¶ 50–52.)  Later in the evening, when Paul's roommate returned home, the apartment door was locked; the roommate asked Paul to open the door, but Paul would not open it.  (*Id.* ¶¶ 61–63.)  All residents assigned to an apartment at Freedom House had equal rights to access the apartment and Paul was not entitled to lock his roommates out of the apartment.  (*Id.* ¶¶ 45, 49.)  Freedom House counselors tried to communicate with Paul to get him to come out of the apartment but were not successful.  (*Id.* ¶ 73.)  "Paul said 'crazy stuff' to House # 19 staff."  (*Id.* ¶ 76.)  The Freedom House counselor also tried to open the door with a key, but Paul turned the locking mechanism to prevent the door from being opened.  (*Id.* ¶¶ 74–75.)  At approximately 9:46 p.m., a Freedom House staff member called 911 and reported that an emotionally disturbed person ("EDP") had locked themselves in a shared room in his apartment.  (*Id.* ¶¶ 79–82.)  NYPD officers from the local precinct responded to the 911 call and arrived at approximately 9:50 p.m.  (*Id.* ¶ 93.)

A Freedom House staff member and the responding officers tried opening the door using a key, but each time Paul turned the locking mechanism to prevent the door from opening.  (*Id.* ¶¶ 110–115.)  A patrol supervisor requested that the Emergency Services Unit ("ESU") and Emergency Medical Services ("EMS") provide assistance.  (*Id.* ¶¶ 116–117.)  Approximately ten to fifteen minutes later, the ESU officers began to arrive.  (*Id.* ¶¶ 123, 145.)  Paul was screaming, banging on the door, and threatening to kill the officers if they touched his door.  (*Id.* ¶¶ 134, 138.)  Officers McCormack and Finbarr McCarthy were assigned to an outside location below street level, under a front window of Paul's apartment in case Paul exited through the windows.  (*Id.* ¶¶ 386–387.)  Officers McCormack and Finbarr McCarthy could not hear anything taking place inside the location and neither had any interaction with Paul before he was in the

ambulance.  (*Id.* ¶¶ 388–391.)

The ESU officers are trained in hostage negotiation techniques, but still called for assistance from the Hostage Negotiation Team ("HNT") and the Technical Assistance Response Unit ("TARU").  (*Id.* ¶¶ 148, 549.)  The officers threw chemical lights (i.e. glow sticks) through a window and used a pole camera to obtain a partial view of Paul.  (*Id.* ¶¶ 159–160, 162, 166.)  The officers attempted to use an under-the-door camera, but Paul would immediately push or kick it out.  (*Id.* ¶¶ 175–175.)  The officers also tried using a remote-control camera, but it became caught on clothing and was unable to navigate the apartment.  (*Id.* ¶¶ 177–178.)

An HNT detective spoke to Paul for a disputed amount of time between five and forty minutes, during which Paul was hostile, told her to shut up, said she was the devil, and demanded $500 in exchange for exiting the apartment.  (*Id.* ¶¶ 180, 184, 187–189.)  After the HNT detective left, Officer DiFrancesca tried to communicate with Paul, but Paul continued to scream, bang, and stated the world was coming to an end.  (*Id.* ¶¶ 196, 198, 202.)  Officers McNamara and Ramos arrived at the location between 11:30 p.m. and 12:00 a.m.  (*Id.* ¶ 206.)  Eventually, the officers decided to cut a hole in the door either to view Paul directly or by using a camera.  (*Id.* ¶ 227.)  The officers attempted to use a circular hole saw to drill a hole in Paul's door, but the drill bit broke.  (*Id.* ¶¶ 239–240.)  The officers then used a Halligan tool to make a starter hole and a Sawzall to begin making a triangular hole.  (*Id.* ¶¶ 241– 246.)  After Defendant Ramos made the second cut in the door, the officers observed blood on the saw blade and Ramos stopped cutting.  (*Id.* ¶¶ 249–250.)  It appeared that Paul might have grabbed onto the blade of the Sawzall.  (*Id.* ¶ 253.)  As blood came from beneath the door, the officers believed there was a medical emergency.  (*Id.* ¶¶ 257, 259.)

Officers DiFrancesca, McNamara, Hefner, O'Doherty, Licitra, and Eugene McCarthy

(the "Entering Officers") arranged themselves one behind another in a tactical formation known as a "stack." (*Id.* ¶ 273.)  The officer at the front of the stack was DiFrancesca, who carried a ballistic shield and taser.  (*Id.* ¶¶ 274–276.)  McNamara was next in the stack and carried a taser. (*Id.* ¶¶ 278, 280.)  Hefner and O'Doherty assumed the role of "hands," meaning they would assist in handcuffing Paul.  (*Id.* ¶¶ 281–284.)  Licitra and Eugene McCarthy were the last two officers in the stack and had a limited view.  (*Id.* ¶¶ 285–288.)  As the Entering Officers pushed open the door and attempted to enter the room, Paul resisted, spat blood at the officers, grabbed the top of the shield, and was tasered.  (*Id.* ¶¶ 304, 310, 316, 319.)  Officers entered the room and Paul was naked on his back on the floor of the hallway.  (*Id.* ¶¶ 328, 322–333.)  The parties dispute whether Paul attempted to get back up before he was tasered again.  (*See id.* ¶¶ 337–346.)  Eventually, Paul was handcuffed and turned over to EMS personnel.  (*Id.* ¶ 377.)

The ambulance carrying Paul left Freedom House at 12:40 a.m. on July 2, 2015.  (*Id.* ¶ 396.)  The parties dispute when Paul arrived at the emergency room and when he was triaged. (*See* Doc. 290 ¶ 5.)  While in the emergency room, Paul was agitated and combative.  (Doc. 287 ¶ 402.)  He had three taser prongs in his body, was noted to have an altered mental status, stated he wanted to die, and attempted to bite emergency department staff.  (*Id.* ¶¶ 404–407.)  At 1:20 a.m. Paul went into cardiac arrest and after an unsuccessful attempt at resuscitation, he was pronounced dead at 1:39 a.m. (Doc. 290 ¶ 7.)

On July 3, 2015, the City Medical examiner, Dr. Monica Smiddy, performed an autopsy on Paul.  (*Id.* ¶ 8.)  On September 22, 2015, Dr. Smiddy issued a report concluding that Paul's manner of death was accident and cause of death was "cardiac arrhythmia due to agitated delirium, (possible drug intoxication)." (*Id.*)  The report also noted blunt impact injuries and contusions of the hands, wrist, and right foot, superficial incised wounds to the hands and

forearms with no injury to major blood vessels, an absence of the big toenail on the right foot, and three taser probes in his skin.  (Doc. 287 ¶¶ 417–418.)

## II.   **Procedural History**

Plaintiff filed their original Complaint on March 16, 2016.  (Doc. 1.)  On October 25, 2016, Plaintiff filed their First Amended Complaint.  (Doc. 151, "FAC".)  The FAC raised claims against the City Defendants under 42 U.S.C. §1983 (unlawful entry, excessive force, *Monell* liability, supervisory liability, and failure to intervene) and New York State Law (negligent hiring, training, and supervision, negligence, wrongful death, assault, battery, and false arrest.  (*See generally*, FAC.)  Plaintiff also raised claims of medical malpractice against both the Hospital and City Defendants.  (FAC ¶¶ 63–134.)

On September 25, 2017, I entered a Memorandum & Opinion resolving the City Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6). (Doc. 174, "MTD Order.")  I granted the City Defendants' motion in part and dismissed the following causes of action:  (1) negligent hiring, training, and supervision on the part of the City; (2) supervisory liability claims against Defendants DiFrancesca, Hefner, McNamara, McCormack, Finbarr McCarthy, and Ramos; (3) claims of New York State statutory violations; (4) claims of negligence against the City; (5) false arrest; and (6) medical malpractice against the City.  (*Id.*)  I also granted the City Defendants' motion to dismiss the wrongful death claim, but Plaintiff was granted leave to re-plead that claim.  (*Id.*)  I denied the City Defendants' motion to dismiss (1) claims against Defendants McCormack and Finbarr McCarthy for lack of personal involvement; (2) the *Monell* claim against the City; and (3) claims against the Individual Defendants for failure to intervene.  (*Id.*)

On October 6, 2017, with my permission, Plaintiff filed their Second Amended

Complaint.  (Doc. 179, "SAC.")  The SAC contains causes of action of:  (1) unlawful entry in

violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, against the Individual

Defendants (First Cause of Action); (2) excessive force in violation of the Fourth Amendment,

pursuant to § 1983, against the Individual Defendants (Second Cause of Action); (3) *Monell*

against the City for maintaining a policy or practice of forceful entry into the space of an isolated

and contained EDP without justification or provocation, and for failure to hire and train, pursuant

to § 1983 (Third Cause of Action); (4) supervisory liability against the Individual Defendants

with supervisory duties, under § 1983 (Fourth Cause of Action); (5) failure to intervene on the

part of Individual Defendants present, under § 1983 (Fifth Cause of Action); (6) negligence

and/or statutory violations of New York State law (Sixth Cause of Action); (7) wrongful death

under New York State law (Seventh Cause of Action); (8) intentional torts under New York

State law (Eighth Cause of Action); and (9) medical malpractice against Defendants HHC and

NCBH (Ninth Cause of Action).  (*See* SAC.)

On October 2, 2020, the City Defendants filed their motion for summary judgment with

supporting papers, (Docs. 264–267), and a motion to exclude evidence with supporting papers,

(Docs. 261–263).  Also on October 2, the Hospital Defendants filed their motions for summary

judgment and to preclude with supporting papers.  (Docs. 268, 273–280.)  On January 4, 2021,

Plaintiff filed memoranda in opposition to the motions, (Docs. 285–286, 293), responses to

Defendants' Rule 56.1 statements, (Docs. 287, 290), a Rule 56.1 Counter Statement of Material

Facts, (Doc. 289), and declarations in opposition to the motions, (Docs. 291–292).  On February

23, 2021, the City Defendants filed a reply in support of their motion for summary judgment,

(Doc. 296), an answer to Plaintiff's response to the City Defendants' Rule 56.1 statement, (Doc.

297), and a reply in support of their motion to preclude, (Doc. 298).  The Hospital Defendants

filed a reply in support of their motion for summary judgment, (Doc. 299), and a reply to

Plaintiff's response to the Hospital Defendants' Rule 56.1 statement, (Doc. 300).

### III.   <u>Legal Standards</u>

#### A.  *Admissibility of Evidence*

#### 1.  **Expert Evidence**

District courts may resolve questions regarding the admissibility of evidence, including

expert reports, at the summary judgment stage.  *See Bah v. Nordson Corp.*, No. 00-CIV-9060

DAB, 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005) (citing *Raskin v. Wyatt Co.*, 125 F.3d

55, 66 (2d Cir. 1997)).  "The determination of whether testimony is admissible as an expert

opinion is multi-factored and flexible."  *United States v. Cantoni*, No. 19-4358-CR, 2022 WL

211211, at *1 (2d Cir. Jan. 25, 2022), *cert. denied*, 142 S. Ct. 2826 (2022).  The admissibility of

expert opinions is evaluated under Federal Rule of Evidence 702, which allows the court to

admit expert testimony provided that:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

Fed. R. Evid. 702.  "The fundamental requirements are thus that such evidence be relevant and

reliable."  *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (citing *Daubert v. Merrell

Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587–92 (1993) ("*Daubert*"); *Kumho Tire Co. v.

Carmichael*, 526 U.S. 137, 141, 152 (1999).  In *Daubert*, the Supreme Court held that the trial

judge is responsible for "the task of ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand."  509 U.S. at 597.  Thus, "[w]hile the proponent of

expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." *Jones*, 965 F.3d at 161 (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (cleaned up)).  "An expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment," as are "[a]n expert's conclusory opinions."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

The inquiry under *Daubert* is limited, and "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Rather, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions."  *Id.* at 267 (citation omitted).  Rule 702 and *Daubert* mandate exclusion where "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached".  *Id.* at 266.  "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony."  *Id.* at 267.

### 2.  Relevance

Pursuant to Federal Rule of Evidence 401, evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action."  Fed. R. Evid. 401.  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  Relevant evidence is admissible unless the Constitution, a federal statute, a rule of evidence, or other rule prescribed by the Supreme Court provides for its

exclusion.  *Id.*  Rule 403 authorizes a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

### B.  *Summary Judgment*

"Summary judgment is appropriate when the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) (citing Fed. R. Civ. P. 56(a)). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Echeverri v. Orange Reg'l Med. Ctr.*, No. 12-CV-584 CS, 2014 WL 12539664, at *1 (S.D.N.Y. Oct. 14, 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is considered "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *Dolan v. Cassella*, 543 F. App'x 90, 91 (2d Cir. 2013) (quoting *Anderson*, 477 U.S. at 248), and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Echeverri,* 2014 WL 12539664 at *1 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  In considering a summary judgment motion, a court

must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (cleaned up). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). "'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment.'" *I.M. v. United States*, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting *Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997)).

In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3); *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."); Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). However, "where the movant 'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary

judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). "[C]onclusory allegations [are] insufficient to survive [a] summary judgment motion." *Crawford v. Levanduski*, 46 F. App'x 25, 26 (2d Cir. 2002).

### IV.   Discussion

#### A.  *The City Defendants' Motions to Exclude*

##### 1.  Expert Opinion by Walter Signorelli

The City Defendants seek to preclude Plaintiff from relying on the opinions of Walter Signorelli, who Plaintiff presents as a police practices expert. (Doc. 262 at 8.) Signorelli opines that the NYPD officers "violated the standards of proper police practices and procedures for handling an emotionally disturbed person" by using a Sawzall and improperly deploying their tasers at Paul. (Doc. 285 at 3.) The City Defendants argue that Signorelli's opinions should be excluded because (1) the opinions are not within the scope of his expertise or experience, (2) the opinions are speculative and unreliable, and (3) the opinions would not assist a trier of fact. (*See* Doc. 262 at 8.) For the reasons below, I will allow Signorelli to offer opinions subject to certain limitations.

The City Defendants attack Signorelli's qualifications. (*Id.* at 9.) Signorelli served in

various positions with the NYPD for thirty-one years.  (Doc. 291-64 at 1.)  Since retiring from

the NYPD, he has taught college courses in police science and criminal law.  (*Id.*)  Signorelli has

extensive experience serving as an expert witness in police standards, including in this Circuit.

*See, e.g., Rizk v. City of New York,* No. 14CV6434PKCRER, 2022 WL 900784, at *2 (E.D.N.Y.

Mar. 28, 2022) (collecting cases).  Despite this experience, notably, "Signorelli testified that he

had never carried a taser while a police officer; that he had never deployed a taser or observed

another officer deploy a taser in the field; that he had never published on the subject of tasers;

that he became only 'somewhat' familiar with tasers in the two to three years prior to his

retirement from the NYPD in 1998; that his more recent familiarity was limited to reading

sources available to the general public, such as court cases and magazines."  (Doc. 262 at 11.)

The only evidence that Plaintiff offers in support of Signorelli's expertise in tasers is that "he has

also reviewed and studied use of force cases, which includes the use of tasers."  (Doc. 285 at 17.)

I find that Signorelli is sufficiently qualified to offer opinions regarding general police practices

and procedures, but not to opine on the specifics of tasers, including the relative danger of using

a taser or his interpretation of data stored in the tasers.  *See Bryans v. Cossette*, No. 3:11-CV-

01263 JCH, 2013 WL 4737310, at *14 (D. Conn. Sept. 3, 2013) (precluding testimony from

retired police officer because he was not an expert in tasers based on his limited experience).

　　　The City Defendants also proffer that Signorelli's opinions are unreliable and unhelpful

to the jury.  (Doc. 262 at 17.)  I disagree.  "The testimony of a police procedures expert may be

found reliable by virtue of that expert's experience."  *Passino v. Tucker,* No. 8:17-CV-1028

(DJS), 2021 WL 2766979, at *2 (N.D.N.Y. July 1, 2021).  In forming his opinions, Signorelli

relied on his extensive experience in police practices, as well as his review of deposition

transcripts, interview transcripts, NYPD reports, the NYPD Patrol Guide, and the Police

Executive Research Forum (PERF) Guidelines. (Doc. 291-64 at 3.) I also find that the average juror would not have knowledge of police procedures and would be aided by Signorelli's testimony. However, Signorelli's opinions will be subject to certain limitations, as is consistent with all expert witnesses. First, Signorelli will not be permitted to opine on the credibility of other witnesses. (*See, e.g.,* Doc. 291-64 at 9 "Detective McNamara's contention that the deployments had no effect was not supported by the facts."); *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("[T]his court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."); *Fate v. Vill. of Spring Valley*, No. 11 CIV. 6838 JPO, 2013 WL 2649548, at *6 (S.D.N.Y. June 13, 2013) (precluding expert on police practices from "offer[ing] testimony about what he believes actually happened or about the credibility of any witness"). Second, Signorelli cannot offer legal conclusions. (*See, e.g.,* Doc. 291-64 at 7 ("In my opinion, the type and amount of force used by the officers against Mr. Paul . . . violated his constitutional rights.")); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (experts may not offer "testimony on issues of law.") Third, Signorelli cannot offer conclusory, ultimate issue opinions. (*See, e.g.,* Doc. 291-64 at 7 ("the type and amount of force used by the officers . . . was excessive."); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16CV1318GBDBCM, 2021 WL 4810266, at *15 (S.D.N.Y. Sept. 30, 2021) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)).

## 2.  Internal Guidance

The City Defendants also seek to preclude Plaintiffs "from relying on the NYPD Patrol Guide or other internal or similar guidance" because they claim such evidence would be inadmissible at trial.  (Doc. 262 at 22.)  Courts in this Circuit have allowed the NYPD Patrol Guide to be offered as evidence when the excerpts offered are relevant and not unduly prejudicial.  *See McLeod v. Llano,* No. 17CV6062ARRRLM, 2021 WL 1669732, at *5 (E.D.N.Y. Apr. 28, 2021) (declining to categorically exclude NYPD Patrol Guide); *Gogol v. City of New York,* No. 15-CV-5703 ER, 2018 WL 4616047, at *4 (S.D.N.Y. Sept. 26, 2018) (same)*; Tardif v. City of New York,* No. 13-CV-4056 KMW, 2017 WL 3634612, at *6 (S.D.N.Y. Aug. 23, 2017) (same); *Nnodimele v. Derienzo,* No. 13-CV-3461 ARR RLM, 2016 WL 3561708, at *14 (E.D.N.Y. June 27, 2016) (same).  I join them and decline to categorically exclude the NYPD Patrol Guide.  I will determine the admissibility of specific portions of the NYPD Patrol Guide during trial.

## B.  *The Hospital Defendants' Motions to Exclude*

### 1.  Computation of Economic Damages

The Hospital Defendants seek to preclude Plaintiff from offering a computation of economic damages for failure to comply with Federal Rule of Civil Procedure 26.  (Doc. 275 at 7–9.)  Rule 26 requires a party to provide the other parties with "a computation of each category of damages claimed by the disclosing party" and "the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based[.]"  Fed. R. Civ. P. 26 (a)(1)(A)(iii).  In response, Plaintiff explains that they are seeking reimbursement of funeral expenses and medical expenses but does not offer any explanation for their failure to comply with Rule 26's disclosure requirements.  (Doc. 286 at 22.)  Failure to timely disclose

Rule 26(a) information can result in sanctions including preclusion, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses. . . ."). The burden to prove that the non-disclosure was substantially justified or harmless falls on the non-disclosing party. *Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 395–96 (S.D.N.Y.2005), *aff'd on other grounds sub nom. Belloto v. Cnty. of Orange,* 248 F. App'x. 232 (2d Cir. 2007). Preclusion is considered a drastic remedy. *Olutosin v. Gunsett*, No. 14-CV-00685 NSR, 2019 WL 5616889, at *4 (S.D.N.Y. Oct. 31, 2019). Although Plaintiff has consistently referred to the amount of $12,306 in funeral and burial expenses and has provided some evidence to support this calculation, (*see, e.g.,* Doc. 291-63), "even a party's own production of documents supporting its theory of damages cannot excuse that party from its separate obligation to disclose a damages computation." *Agence France Presse v. Morel*, 293 F.R.D. 682, 684 (S.D.N.Y. 2013) (collecting cases). Plaintiff is hereby ordered to provide a proper Rule 26 disclosure of the damages they seek within thirty (30) days of this order. Failure to provide a damages analysis pursuant to Rule 26(a) will result in preclusion.

## 2. Expert Opinion by Dr. Evan Cohen[2]

The Hospital Defendants seek to exclude the opinions offered by Dr. Evan Cohen as unreliable, conclusory, speculative, and not supported by sufficient facts or data. (Doc. 275 at 14.) Dr. Cohen offered an affidavit in which he offers opinions related to the causes of Paul's death. (Doc. 291-33 at 4, "Cohen Affidavit.")

---

[2] In their preliminary statement, the Hospital Defendants state they are seeking an order to exclude the opinions of both Dr. Cohen and Dr. Whaley, (Doc. 275 at 2); however, their motion only offers arguments related to exclusion of Dr. Cohen. As a result, the argument that Dr. Whaley should be excluded is deemed waived.

The Hospital Defendants challenge Dr. Cohen's qualifications and argue that his "experience treating excited delirium is quite limited." (Doc. 275 at 18.) At the time of drafting his affidavit, Dr. Cohen was a practicing emergency medicine physician and assistant medical director of the emergency room at New York Presbyterian Hospital in Cortlandt Manor, New York. (Doc. 291–33 at 2.) Although Dr. Cohen has only treated five patients with excited delirium, this is not surprising considering the parties agree that the condition is rare. (Doc. 299 at 6.) Dr. Cohen's experience treating patients with other emergency medical conditions provides him with knowledge that may inform his opinions here. I find that Dr. Cohen's experience, training, and education qualify him to testify as an expert in the field of emergency medical care.

Contrary to the claims of the Hospital Defendants, it is not the case "that an expert must back his . . . opinion with published studies that unequivocally support his . . . conclusions" so long as the expert uses other reliable methods. *Amorgianos*, 303 F.3d at 266–67. In forming his opinions, Dr. Cohen reviewed Paul's medical records, various witnesses' deposition testimony and interview transcripts, American College of Emergency Physicians ("ACEP") guidelines, and guidelines from the physician database "UpToDate." (Doc. 286 at 21.) UpToDate is peer-reviewed, physician-authored, and has been used by other medical experts. *See, e.g., Kidd v. Candy Fleet, LLC*, No. CV 16-71, 2016 WL 6969437, at *5 (E.D. La. Nov. 29, 2016) (allowing expert testimony relying on UpToDate). Most of the Hospital Defendants' challenges to Dr. Cohen's report are matters for cross-examination, not exclusion. I find that Dr. Cohen's testimony is sufficiently reliable to satisfy the requirements of Rule 702 and *Daubert* and, therefore, deny the Hospital Defendants' motion to exclude.

## C.  *The City Defendants' Motion for Summary Judgment*

The City Defendants move for summary judgment on the grounds that (1) the officers' entry was lawful based on consent and exigent circumstances, (2) there is no evidence that Defendants caused Paul's death or that the force used to restrain him was excessive, (3) McCormack and McCarthy were not personally involved, (4) there is no *Monell* liability because there is no underlying constitutional violation and no unconstitutional practice or deliberate indifference, (5) there is no supervisory liability because there is no underlying constitutional violation and no gross negligence by any supervisor, (6) there is no claim for failure to intervene because there is no violation of a right and no realistic opportunity to intervene to prevent any alleged harm, (7) there are no negligence claims against DiFrancesca, McNamara, and Ramos because Plaintiff only alleges intentional acts, (8) there are no assault, battery, or wrongful death claims because force was not excessive, (9) the City Defendants are entitled to qualified and state law immunities as to all federal and state law claims, and (10) punitive damages are not warranted.  (*See* Doc. 265.)  For the reasons that follow, the City Defendants' motion is granted in part and denied in part.

### 1.  Unlawful Entry

The Fourth Amendment protects against "unreasonable searches and seizures."  U.S. Const. amend. IV.  The City Defendants assert that the officers' entry into Paul's home was not unlawful because it was done with consent and under exigent circumstances.  (Doc. 265 at 13–16.)  Plaintiff argues that because Paul was alone in his room and had not broken any law, the officers could not enter his room.  (Doc. 293 at 34.)  "[A] warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of 'unreasonable searches and seizures' if the officers have obtained the consent of a third party who possesses

common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990) (quoting *United States v. Matlock*, 415 U.S. 164 (1974)); *see also Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 167 (2d Cir. 2002).

Paul resided in a shared apartment at Freedom House. (Doc. 287 ¶¶ 46–47.) When Paul did not allow one of his roommates into the shared space, the roommate notified Freedom House staff. (*Id.* ¶ 71.) When a counselor was unable to get Paul to exit the apartment, or to open the door using their key, a Freedom House staff member called 911. (*Id.* ¶¶ 73–75, 79–80.) As a probationer, Paul had a diminished expectation of privacy. (*Id.* ¶¶ 2–5.) *United States v. Reyes*, 283 F.3d 446, 457 (2d Cir. 2002) ("It is beyond doubt that [probationer]'s actual expectation of privacy in the environs of his home was necessarily and significantly diminished because [he] was . . . serving a court-imposed term of federal supervised release that mandated home visits 'at any time' from his federal probation officer.") Freedom House staff could provide the officers consent to enter the room because residents of Freedom House were required to sign an agreement confirming that the staff could enter the residents' apartments at any time, without notice. (Doc. 287 ¶¶ 30–31.) The officers received consent from the Freedom House staff when they were called to respond to Paul locking himself in the room and given a key to enter the apartment. (Doc. 287 ¶¶ 79–80, ¶¶ 110–112.) Because the Freedom House staff could and did provide consent for the officers to enter Paul's room, their entrance was not a violation of the Fourth Amendment. *See Jones v. Meehan*, No. 14 CIV. 6402 KPF, 2018 WL 459662, at *9 (S.D.N.Y. Jan. 16, 2018) (finding that warrantless entry did not violate the Fourth Amendment because "although the officers did not have a warrant to enter the residence, given Plaintiff's lessened expectation of privacy as a parolee, the halfway house manager's consent validated their entrance into the halfway house.") In finding that the officers had consent to enter Paul's

residence, I do not determine whether there were also exigent circumstances. Accordingly, the City Defendants' motion for summary judgment on Plaintiff's unlawful entry claim is granted.

### 2. Excessive Force, Supervisory Liability, and Failure to Intervene

Since excessive force and supervisory liability claims are subject to the same standard, I consider these claims together. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Regardless of whether the defendant was a supervisor, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Even if an officer does not violate the Constitution through their own actions, they may still be liable under § 1983 for failure to intervene "if the officer was present at the assault, and fails to intervene to prevent the harm when he or she had a reasonable opportunity to do so." *Raffaele v. City of New York*, 242 F. Supp. 3d 152, 156 (E.D.N.Y. 2017).

The City Defendants argue that there was not an underlying constitutional violation because the force used was not excessive. (Doc. 265 at 29–31.) Plaintiff argues that excessive force is evidenced by the officers alleged use of tasers after Paul was handcuffed and use of a saw in an area that Paul had his face pressed against. (Doc. 293 at 35–36.) Force is excessive when it is "objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motive." *Carpenter v. City of New York*, 984 F. Supp. 2d 255, 267 (S.D.N.Y. 2013) (quoting *Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)). This is a fact-specific determination. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) ("Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.") I disagree

with City Defendants' claim that "[g]iven the fast-moving scenario in the dark and confined space in the entryway of the apartment, no jury could find that any supervisor violated the law by his own conduct via direct participation with knowledge of the relevant facts." (Doc. 296 at 10.) Plaintiff has identified sufficient record evidence to raise questions of material fact for the jury such that I cannot find that no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.

The City Defendants also argue that there is no evidence that any of the officers' actions caused Paul's death or any pain or suffering. (Doc. 265 at 18–22.) The argument that the City Defendants were not responsible for Paul's death is irrelevant because death is not the standard for an excessive force claim. *See Hayes v. N.Y.C. Police Dep't*, 212 F. App'x. 60, 62 (2d Cir. 2007) (summary order) ("[W]e have permitted claims to survive summary judgment where the only injury alleged is bruising.") Plaintiff identifies sufficient record evidence related to whether Paul experienced pain and suffering, including Paul's wounds and hospital records, to raise questions of material fact for a jury to decide. (Doc. 293 at 27.)

The City Defendants also claim that summary judgment should be granted on the excessive force claim as it relates to use of the saw because it was not intended as an instrumentality of force. (Doc. 265 at 17.) Although there is not a breadth of case law relating specifically to injuries caused by officers using saws to enter a door, in analogous circumstances, courts have found that officers who enter a residence using a battering ram cannot be liable for excessive force "absent some indication of harmful bodily contact in making the entry." *Lewis v. Bureau of Alcohol, Tobacco & Firearms*, No. 16-CV-1057(KAM)(JO), 2018 WL 4853043, at *9 (E.D.N.Y. Oct. 4, 2018); *see Hellman v. Gugliotti*, 279 F. Supp. 2d 150, 156–57 (D. Conn. 2003) (granting defendants' motion for summary judgment where plaintiff concedes that no physical

force was used against her person).  Here, there appears to be harmful bodily contact between the

saw and Paul as evidenced by, among other things, the injuries Paul sustained to his hands.

Further, Plaintiff asserts that the officers used the saw with the intent of harming Paul.  Whether

or not the evidence supports this assertion is a question of fact for the jury.

The parties dispute whether all the Individual Defendants can be liable for excessive

force.  However, the City Defendants and Plaintiff agree that Officers McCormack and Finbarr

McCarthy were not personally involved in the incident in question, so I need not review their

conduct and may dismiss all claims against them.  (*See* Doc. 293 at 36; Doc 265 at 23.)  The City

Defendants claim Plaintiff failed to demonstrate that defendants Giordano, Eugene McCarthy,

Licitra, and O'Doherty directly participated in a constitutional violation.  (Doc. 265 at 30–31.)

Direct participation in a constitutional violation "includes a person who authorizes, orders, or

helps others to do the unlawful acts, even if he or she does not commit the acts personally."

*Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014).  Here, most of the officers did directly

participate in the actions Plaintiff alleges were unconstitutional:  Licitra gave the order to use the

saw that cut Paul, (Doc. 293 at 9, 23), McNamara and DiFrancesca used their tasers against Paul,

(*see* Doc. 287 ¶¶ 322, 356), Ramos used the Sawzall that cut Paul and, along with Hefner, placed

Paul in handcuffs, (*id.* ¶¶ 248, 377).  Accordingly, excessive force claims against these officers

survive summary judgment.

With regard to Giordano, Eugene McCarthy, and O'Doherty, although there is no

evidence they used or ordered the use of any force against Paul, they were all present and may

still be liable for failure to intervene.  "A police officer is under a duty to intercede and prevent

fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure

to do so if he observes the use of force and has sufficient time to act to prevent it."  *Figueroa v.*

*Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).  To state a claim against an officer for his or her failure

to intervene, a plaintiff must allege facts demonstrating that "(1) the officer had a realistic

opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position

would know that the victim's constitutional rights were being violated; and (3) the officer does

not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512

(S.D.N.Y. 2008), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012). "A

police officer cannot be liable on a failure to intercede theory, however, if he participates directly

in the alleged constitutional violation." *Buari v. City of New York*, 530 F. Supp. 3d 356, 392

(S.D.N.Y. 2021).  "Whether the officer had a realistic opportunity to intervene is normally a

question for the jury, unless, considering all the evidence, a reasonable jury could not possibly

conclude otherwise." *Terebesi,* 764 F.3d at 244 (internal quotation marks omitted).  Plaintiff

claims, and identifies evidence to support, that Paul was tasered multiple times over several-

minutes, including after he was handcuffed.  (Doc. 289 at ¶¶ 136, 163, 197.)  Accepting

Plaintiff's version of events, a reasonable jury could also find that the officers Giordano,

McCarthy, and O'Doherty who were present had "a realistic opportunity to intervene to prevent

the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  Accordingly,

Plaintiff's claims for failure to intervene survive against Defendants Giordano, McCarthy, and

O'Doherty.

### 3.  *Monell* Liability

Plaintiff alleges that the City of New York is liable under Section 1983 because the City

has "maintained a custom, practice, and/or policy of forcefully entering the space of EDPs who

are isolated and contained without justification or provocation, for the sole purpose of inserting

cameras."  (Doc. 293 at 27.)  By its terms, Section 1983 applies "only to individual 'persons'

responsible for violating plaintiffs' rights." *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) (citation omitted).  "[T]o prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  The City Defendants assert that Plaintiff cannot prove the second (an underlying constitutional violation), third (causation), or fifth (an unconstitutional policy) elements.  As explained above, whether there is an underlying violation of Paul's constitutional rights is a matter to be determined by a jury.

The City Defendants claim that even if Plaintiff can prove a violation of Paul's rights, they cannot "prove the existence of an unconstitutional policy or custom of the City and establish a causal connection . . . between the policy and the deprivation of his constitutional rights." (Doc. 265 at 24.)  To establish *Monell* liability based on an unwritten, but widespread practice, the practice must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970); *see also Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.")

Plaintiff alleges there is "a pattern of misconduct to which the City of New York was deliberately indifferent," (Doc. 293 at 30), and that "Defendants' employees were not properly trained or supervised in handling EDPs," (*id.* at 31).  In support, Plaintiff points to the "Final Summary Report of Firearms Discharge #2012-87," (the "Bah Memo"), which concerns the

death of Mohamed Bah, an EDP who was killed by NYPD officers in 2012.  (*Id.* at 27–29; *see generally* Doc 295-7.)  Defendant Licitra was also involved in the Bah incident.  The Bah Memo states that "there is some history with the emergency service unit and emotionally disturbed persons' response to door openings.  On several occasions in the past, while attempting to make partial door breaches to insert cameras, the emotionally disturbed person has charged the door.  Once this occurs, ESU personnel have no choice but to engage.  But if the door was never breached, they would not have found themselves in that situation." (Doc. 295-7 at 11.)  Neither the report, nor Plaintiff after completing fact discovery, offer any further detail or evidence related to other occasions where partial door breaches have led to officers engaging with an EDP.  The Plaintiff also fails to provide any expert testimony related to prior occasions where an EDP charges a door after a partial breach.

Plaintiff cites to *Kucharczyk v. Westchester County* as support that the Bah Memo is sufficient evidence to establish pattern and practice.  95 F. Supp 3d 529 (2015).  *Kucharczyk* is distinguishable for at least two reasons.  First, *Kucharczyk* was at the motion to dismiss stage, where a plaintiff need only plausibly allege a claim based upon allegation in a complaint.  Second, the Department of Justice report at issue in *Kucharczyk* was produced after an investigation of videos, documents, and internally prepared Westchester County Jail reports of multiple incidents.  95 F. Supp 3d at 544.  In contrast, the Bah Memo represents the findings of an investigation into just one incident, and ambiguously refers to the existence of other alleged incidents involving EDPs without providing any details of those incidents.  The Bah Memo does not involve investigation of police handling of EDPs at different times, in different circumstances, and, on its own, cannot establish a practice "so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware."

*Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020); *see Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012) (There must be "sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse."); *Giaccio v. City of New York*, 308 F. App'x. 470, 472 (2d Cir. 2009) (affirming summary judgment dismissing *Monell* claim where plaintiff identified only four examples of constitutional violations, because the evidence "falls far short of establishing a practice that is so persistent and widespread to justify the imposition of municipal liability.") (internal quotation marks omitted).

Plaintiff also sets forth a theory of *Monell* liability based on a failure to train the officers. (Doc. 293 at 31.)  "It is Plaintiff's burden to identify a specific deficiency in the city's training program and disciplinary practices and establish that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation."  *Hanson v. New York City*, No. 15-CV-1447 (MKB), 2018 WL 1513632, at *21 (E.D.N.Y. Mar. 27, 2018) (internal quotation marks omitted).  Plaintiff does not present any evidence regarding the training practices of the NYPD related to EDPs.  Plaintiff's expert, Signorelli, opines that the actions taken by the officers was "a violation of proper police practices and procedures," but does not opine that the officers' actions were part of a widespread practice of purposefully opening doors of isolated and contained EDPs.  (Doc. 291-64 at 6.)

Reviewing the facts in the light most favorable to Plaintiff, I find that the evidence presented is not sufficient to raise a question of material fact to be determined by a jury. Accordingly, the City Defendants' motion for summary judgment as to the *Monell* cause of action against the City is granted.

### 4. Negligence Claims Against DiFrancesca, McNamara, and Ramos

The City Defendants argue that Plaintiff's claims of negligence must fail because a plaintiff cannot prevail on a negligence claim where they also claim intentional use of excessive force. (Doc. 265, 33–34.) I disagree. Generally, Plaintiffs are free to plead alternate theories of liability. *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 55 n.3 (2d Cir. 2004) ("[E]ven if the theories are inconsistent, Federal Rule of Civil Procedure 8(e)(2) permits pleading inconsistent theories in the alternative."); *Brown v. City of New York*, No. 02 CV 6337 NG LB, 2005 WL 758781, at *4 (E.D.N.Y. Mar. 30, 2005) ("While it is true that the same factual predicate cannot support both a finding of liability based on reckless or intentional conduct and a finding of liability based on negligent conduct, plaintiff is free to plead alternate theories of liability, even if those theories are inconsistent."). It is specifically accepted in this District that claims of excessive force and negligence may be pled in the alternative, so long as a reasonable jury could find that the complained of actions were either intentional or negligent. *Daniels v. City of New York*, No. 16-CV-9080 (AJN), 2018 WL 4680990, at *5 (S.D.N.Y. Sept. 27, 2018) (collecting cases); *Pateman v. City of White Plains*, No. 17-CV-6156 (KMK), 2020 WL 1497054, at *24 (S.D.N.Y. Mar. 25, 2020). In fact, a case cited by the City Defendants confirms that "Plaintiff is entitled to plead in the alternative at [the summary judgment] stage." *Bleiwas v. City of New York*, No. 15 CIV. 10046 ER, 2017 WL 3524679, at *7 (S.D.N.Y. Aug. 15, 2017). Here, a reasonable jury could find that the officers' actions, such as using the Sawzall or tasers, were either negligent or intentional. Accordingly, the City Defendants' motion for summary judgment on Plaintiff's negligence claims against DiFrancesca, McNamara, and Ramos is denied.

### 5.   Assault, Battery, and Wrongful Death Claims

For the same reasons that the City Defendants seek summary judgment on Plaintiff's

excessive force claims, they also seek summary judgment on Plaintiff's assault, battery, and

wrongful death claims.  Plaintiff's state law assault and battery claims are almost identical to

their federal excessive force claim.  *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009)

(quoting *Posr v. Doherty*, 944 F.2d 92, 94-95 (2d Cir. 1991)) ("[E]xcept for § 1983's

requirement that the tort be committed under color of state law, the essential elements of" claims

under § 1983 and New York assault and battery are "substantially identical".)  A claim for

wrongful death requires "(1) the death of a human being, (2) the wrongful act, neglect or default

of the defendant by which the decedent's death was caused, (3) the survival of distributees who

suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal

representative of the decedent." *Quinn v. United States*, 946 F. Supp. 2d 267, 277 (N.D.N.Y.

2013) (citation omitted).  Plaintiff correctly identifies that there are factual issues that preclude

summary judgment related to whether the City Defendants caused Plaintiff's death.  (Doc. 293 at

35.)  Because summary judgment is not appropriate for Plaintiff's claim of excessive force, for

the reasons detailed *supra*, it necessarily follows that the assault, battery, and wrongful death

claims cannot be resolved on summary judgment.  Accordingly, the City Defendants' motion for

summary judgment on Plaintiff's assault, battery, and wrongful death claims is denied.

### 6.   Qualified and State Law Immunities

Qualified immunity applies when an officer reasonably believes that their actions did not

violate clearly established law.  *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see also Cerrone v.*

*Brown*, 246 F. 3d 194, 203 (2d Cir. 2001).  The City Defendants argue that the Individual

Defendants are entitled to immunity because there is "no evidence here that the officers acted

without reasonable basis or in bad faith." (Doc. 265 at 38.) Plaintiff points to the officers'

alleged tasing of Paul after he was in handcuffs and delay in calling EMS as supporting a finding

that their actions were not objectively reasonable. (Doc. 293 at 25.) "Summary judgment on

qualified immunity grounds is not appropriate when there are facts in dispute that are material to

a determination of reasonableness." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). Here,

the parties dispute many facts, including, among other things: whether Paul was a possible

danger to himself, whether Paul had a weapon, how long the hostage negotiator attempted to

speak to Paul, how long EMS took to treat Paul, and how many times Paul was tased. (*See* Doc.

287 ¶¶ 144, 168, 180, 260, 346.) Given these factual disputes, I cannot determine as a matter of

law whether the officers' actions were objectively reasonable. *See Pal v. Cipolla*, No. 20-4222-

CV, 2022 WL 766417, at *3 (2d Cir. Mar. 14, 2022) (refusing to find as a matter of law that the

officer's beliefs were "objectively reasonable" due to the disputed facts). Accordingly, the City

Defendants' motion for summary judgment on qualified and state law immunities is denied.

### 7. **Punitive Damages**

42 U.S.C. § 1983 authorizes punitive damages when the complained of conduct was

"motivated by evil motive or intent, or when it involves reckless or callous indifference to

federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). This is typically a

question for the jury to decide. *See Phelan ex rel. Phelan v. Torres*, No. 04 CV3538 ERK, 2005

WL 4655382, at *15 (E.D.N.Y. Sept. 20, 2005). Where, as here, a plaintiff "has provided

sufficient evidence to overcome summary judgment with respect to excessive force, the Court

cannot state as a matter of law that the [plaintiff] is not entitled to punitive damages." *Lazaratos

v. Ruiz*, 00–CV–2221, 2003 WL 22283832, at *9 (S.D.N.Y. Sept. 30, 2003); *Woods v. City of

Syracuse*, No. 5:15-CV-027-BKS-ATB, 2017 WL 11567919, at *14 (N.D.N.Y. Feb. 1, 2017);

*Lee v. Cnty. of Onondaga*, No. 513CV01285BKSTWD, 2016 WL 9441472, at \*10 (N.D.N.Y. Aug. 19, 2016).  Accordingly, the City Defendants' motion for summary judgment on punitive damages is denied.

### D.    *The Hospital Defendants' Motion for Summary Judgment*

### 1.   **Medical Malpractice**

The elements of a claim of medical malpractice under New York Law are "(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage."  *Zorn v. Mount Sinai Med. Ctr., Inc.*, No. 09 CIV. 3228 LTS, 2012 WL 4320575, at \*2 (S.D.N.Y. Sept. 20, 2012) (internal quotation marks omitted). Plaintiff's SAC alleges that because of the Hospital Defendants deviation from the acceptable standard of care, Paul suffered "great pain, agony, injury, and suffering."  (SAC ¶¶ 106–112.) The Hospital Defendants claim that there are no triable issues of fact regarding whether they breached the standard of care or whether that breach was the proximate cause of Paul's injuries. (Doc. 275 at 21.)  The Hospital Defendants' expert Dr. Andrew Stolbach opines that the Hospital Defendants did not breach the standard of care nor cause or contribute to Paul's death.  (*See* Doc 291-78.)  Plaintiff's expert, Dr. Cohen, opines that "the treatment of Mr. Paul did not meet the standard of care" and that "delays in treatment of Mr. Paul was a substantial factor in causing his death."  (Doc. 291-33 at 3–4.)  "Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions.  Such conflicting expert opinions will raise credibility issues which can only be resolved by a jury."  *Tarqui v. United States*, No. 14-CV-3523, 2017 WL 4326542, at \*7 (S.D.N.Y. Sept. 27, 2017) (quoting *DiGeronimo v. Fuchs*, 957 N.Y.S.2d 167, 171 (App. Div. 2012); *see also In re Joint E & S Dist. Asbestos Lit.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not arrogate the jury's role

in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts" (cleaned up)); *Perry v. City of New York*, No. 13-CV-1015, 2018 WL 1474401, at \*9 (S.D.N.Y. Mar. 26, 2018) (denying summary judgment where, in addition to "the opposing views of [the] two experts, there are gaps in the facts provided that do not permit determining which view is accurate").

The Hospital Defendants also argue that Plaintiff cannot recover damages for pain and suffering because there is no proof that the alleged malpractice caused decedent to experience conscious pain and suffering. (Doc. 275 at 18.)  The Hospital Defendants identify testimony by Plaintiff's expert Dr. Cohen that "it is likely [Paul's] perception of pain was different from yours or mine.  To what extent, I don't know."  (*Id.* at 19.)  Dr. Cohen's uncertainty during his deposition may impact his credibility to the jury, but it does not foreclose a jury from finding that Paul experienced conscious pain and suffering.  Plaintiff may meet their burden of proving conscious pain and suffering "by direct or circumstantial evidence."  *Granata v. City of White Plains*, 162 A.D.3d 641, 644, 78 N.Y.S.3d 397, 400 (2018); *Cummins v. Cnty. of Onondaga*, 84 N.Y.2d 322, 324–25, 642 N.E.2d 1071, 1072 (1994) (same).  Plaintiff identifies sufficient record evidence, including witness testimony and Paul's hospital records, to preclude summary judgment as to whether Paul experienced conscious pain and suffering.

### 2.  Wrongful Death

Under New York law, a claim for wrongful death requires "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent."  *Quinn*, 946 F. Supp. 2d 277 (citation omitted).  "Damages in a wrongful death action are limited to pecuniary

injuries suffered by the distributees of the decedent's estate." *Bacchus-Sirju v. Hollis Women's Ctr.*, 196 A.D.3d 670, 673–74 (N.Y. App. Div. 2021).

The Hospital Defendants argue that there are no pecuniary loss damages causally related to the wrongful act (i.e., the alleged malpractice), nor evidence that a distributee sustained any loss. (Doc. 275 at 9–12.) Plaintiff concedes that they are not seeking pecuniary damages from the Hospital Defendants but believe they are entitled to reimbursement of funeral and expenses. (Doc. 288 at 22.) "Loss of support, voluntary assistance and possible inheritance, as well as medical and funeral expenses incidental to death, are injuries for which damages may be recovered." *Johnson v. Richmond Univ. Med. Ctr.*, 101 A.D.3d 1087, 1088, 956 N.Y.S.2d 568, 570 (2012) (citation omitted); *Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663, 668, 569 N.Y.S.2d 915, 572 N.E.2d 598 (same). Plaintiff has set forth inconsistent evidence regarding who paid for Paul's burial and funeral expenses. Paul's father testified that he covered the funeral costs, which were between $12,000 and $13,000. (Doc 277-15 at 26.) Plaintiff's uncle, Alberty Paul, testified that Paul's uncles and aunt paid for his funeral expenses, and it was "incorrect" that Paul's father paid for funeral expenses. (Doc. 277-18 at 104–105.) Paul's aunt, Marilyn Abrahams, submitted an affidavit stating that she and her husband purchased Paul's burial plot and contributed to the funeral home expense. (Doc. 291-79.) Abrahams also stated that Paul's father promised to pay her back with proceeds from the lawsuit if the suit was successful. (*Id.*) Because there are disputes regarding who paid for Paul's funeral and burial expenses and whether Paul's father was responsible for reimbursing them, this claim cannot be resolved on summary judgment.

**V.**   **Conclusion**

For the foregoing reasons, I hereby find that:

- the City Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims for unlawful entry and *Monell* liability and DENIED as to the remaining claims;

- the Hospital Defendants' motion for summary judgment is DENIED;

- the City Defendants' motion to exclude Walter Signorelli is GRANTED IN PART and DENIED IN PART.  Signorelli may offer opinions regarding general police practices and procedures, but may not opine on the specifics of tasers, credibility of other witnesses, legal conclusions, or ultimate issues;

- the City Defendants' motion to exclude the NYPD Patrol Guide and other internal materials is DENIED;

- the Hospital Defendants' motion to exclude computations of damages is DENIED; and

- the Hospital Defendants' motion to exclude testimony by Dr. Evan Cohen is DENIED.

The Clerk of Court is respectfully directed to terminate the open motions on the docket and to dismiss the City of New York and Officers McCormack and Finbarr McCarthy as defendants.

SO ORDERED.

Dated: May 30, 2023
      New York, New York

Vernon S. Broderick
United States District Judge